# EXHIBIT "1"

1   Brendan W. Brandt (SBN 150603)
    Andrew R. Morand (SBN 278509)
2   VARNER & BRANDT, LLP
    3750 University Avenue, Suite 610
3   Riverside, California 92501-3323
    Tel:  (951) 274-7777
4   Fax:  (951) 274-7770

5   Attorneys for Plaintiff
    STATER BROS. MARKETS

COPY

FILED
SUPERIOR COURT
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

MAR 2 6 2018

BY _____
    SANDRA ORTEGA/DEPUTY

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 FOR THE COUNTY OF SAN BERNARDINO

10

11   STATER BROS. MARKETS,            Case No.  CIVDS 1807116

12              Plaintiff,            COMPLAINT FOR BREACH OF
                                      CONTRACT
13        v.

14   CAROLINA TRANSPORTATION, INC.;
     AND DOES 1 THROUGH 25,
15   INCLUSIVE,

16              Defendants.

17

18        Plaintiff STATER BROS. MARKETS alleges as follows:

19                    **PRELIMINARY ALLEGATIONS**

20        1.    Plaintiff STATER BROS. MARKETS ("*STATER*") is, and at all times mentioned

21   herein was, a corporation duly organized and existing under the laws of the State of California,

22   registered to do business in the State of California, in good standing with the Secretary of State of

23   California, and doing business in the County of San Bernardino, State of California.

24        2.    Plaintiff STATER is informed and believes, and thereon alleges, that Defendant

25   CAROLINA TRANSPORTATION, INC. ("*CAROLINA*"), is, and at all material times mentioned

26   herein was, a North Carolina corporation doing business in the County of San Bernardino, State of

27   California.

28

                              1.

                         COMPLAINT

3.     Plaintiff STATER is presently unaware of the true names of the Defendants sued in this action as Does 1 through 25, inclusive.  Plaintiff STATER is informed and believes, and thereon alleges, that each of the Defendants was acting in the capacity of agents, servants, employees, or in concert with each other concerning the transactions at issue in this case.  Once Plaintiff STATER ascertains the true names of the Doe Defendants, Plaintiff STATER will seek leave of this Court to amend the Complaint.

4.     Jurisdiction and venue are proper in this Court because the real property which is the subject of the sublease alleged herein is located in the City of Redlands, County of San Bernardino, State of California, and all obligations under such sublease were to be performed within the jurisdictional boundaries of this Court, and pursuant to Section 33 of the master lease alleged herein, venue should be located in the county in which the real property is located.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

5.     Plaintiff STATER incorporates by reference each and every allegation contained in Paragraphs 1 through 4 above as though fully set forth hereat.

6.     Plaintiff STATER at all times herein mentioned unless otherwise stated, was the lessee of that certain real property, including all improvements located thereon, commonly known as 1450 Mountain View Avenue, City of Redlands, County of San Bernardino, State of California (*"Premises"*), pursuant to that certain Gross Lease (Modified) (*"Master Lease"*), dated January 9, 2009, by and between Western A West CA, LLC, a Delaware limited liability company, as successor-in-interest to Landlord (*"Master Lessor"*), and Plaintiff STATER, as Tenant.  A true and correct copy of the Master Lease is attached as *Exhibit "A"* hereto and incorporated herein by reference.

7.     On or about February 6, 2018, Plaintiff STATER, as Sublessor, and Defendant CAROLINA, as Sublessee, entered into that certain Standard Sublease (*"Sublease"*), pursuant to which Plaintiff STATER subleased to Defendant CAROLINA, and Defendant CAROLINA subleased from Plaintiff STATER, the Premises, upon the terms and conditions contained in the

2.

1  Sublease.  A true and correct copy of the Sublease is attached as *Exhibit "B"* hereto and is
2  incorporated herein by this reference.

3       8.  On or about February 26, 2018, Master Lessor of the Premises, along with Plaintiff
4  STATER and Defendant CAROLINA, executed that certain Consent by Landlord to Sublease with
5  respect to the Sublease.  A true and correct copy of the executed Consent by Landlord to Sublease
6  is attached as *Exhibit "C"* hereto and incorporated herein by this reference.

7       9.  On or about February 28, 2018, Plaintiff STATER informed Defendant
8  CAROLINA that the keys to the Premises were ready for pick up and Defendant CAROLINA took
9  possession of the keys to the Premises on February 28, 2018.

10       10.  Pursuant to Sections 1.3 through 1.6 of the Sublease, the term of the Sublease was
11  for 11.5 months, commencing on February 15, 2018 (*"Commencement Date"*), and ending on
12  January 31, 2019 (*"Expiration Date"*), the Base Rent was $32,104.80 per month, payable on the
13  first day of each month commencing March 2018, and the Security Deposit was $32,104.80, for a
14  total of $64,209.60 due upon execution of the Sublease.

15       11.  Pursuant to Section 3.2 of the Sublease, if Plaintiff STATER was unable to deliver
16  possession as agreed (*i.e.*, by the Commencement Date), Plaintiff STATER shall not be subject to
17  any liability therefor, nor shall such failure affect the validity of the Sublease.  In such case,
18  Defendant CAROLINA's obligation to pay rent or perform its other obligations is deferred until it
19  receives possession of the Premises.

20       12.  Section 3.2 of the Sublease further provides that Defendant CAROLINA may only
21  cancel the Sublease if possession of the Premises is not delivered within 60 days after the
22  Commencement Date.  Sixty days after the Commencement Date in this matter would be April 16,
23  2018.  Defendant CAROLINA must provide written notice of such cancellation to Plaintiff
24  STATER within 10 days after the end of such 60-day period.

25       13.  On or about March 1, 2018, Michael Reed, Vice President of Real Estate for Plaintiff
26  STATER, notified Cody Clayton, the broker representing Defendant CAROLINA, by email that
27  Plaintiff STATER was ready to transfer possession of the Premises to Defendant CAROLINA.
28  Later that same day, Mr. Clayton responded to Mr. Reed's email stating that his client, Defendant

1  CAROLINA, was not yet ready for the possession transfer and would likely provide STATER with

2  a timeline for the transfer of possession of the Premises soon, likely the next day.  True and correct

3  copies of the above-mentioned email communications are attached as *Exhibit "D"* hereto and

4  incorporated herein by this reference.

5       14.   On or about March 5, 2018, Michael Babchenko of Defendant CAROLINA sent an

6  email to Cody Clayton, the broker representing Defendant CAROLINA, stating that the CEO of

7  Defendant CAROLINA unilaterally decided to cancel the Sublease.  A true and correct copy of Mr.

8  Babchenko's March 5, 2018, email is attached as *Exhibit "E"* hereto and incorporated herein by

9  this reference.

10      15.   On or about March 6, 2018, Cody Clayton, the broker representing Defendant

11  CAROLINA, forwarded to Plaintiff STATER Mr. Babchenko's March 5 email.  Mr. Clayton noted

12  that he had been unable to communicate with his point of contact at Defendant CAROLINA since

13  March 1, 2018, and the only communication he received from Defendant CAROLINA concerning

14  the Sublease was Mr. Babchenko's March 5 email.  Michael Reed, Plaintiff STATER's Vice

15  President of Real Estate, promptly replied to Mr. Clayton that same day informing him that

16  Defendant CAROLINA cannot cancel the Sublease and urgently requesting that a conference call

17  be scheduled between Mr. Reed and Defendant CAROLINA.  True and correct copies of the above-

18  mentioned email communications are attached as *Exhibit "F"* hereto and incorporated herein by

19  this reference.

20      16.   On or about March 8, 2018, counsel for Plaintiff STATER sent written

21  correspondence to Defendant CAROLINA notifying Defendant CAROLINA that it has no legal

22  right to terminate the Sublease and demanding Defendant CAROLINA perform its obligations

23  under the Sublease.  A true and correct copy of March 8, 2018, written correspondence is attached

24  as *Exhibit "G"* hereto and incorporated herein by this reference.

25      17.   On or about March 13, 2018, counsel for Plaintiff STATER received written

26  correspondence from Defendant CAROLINA informing Plaintiff STATER that Defendant

27  CAROLINA refused to honor the Sublease.  A true and correct copy of Defendant CAROLINA's

28  written correspondence is attached as *Exhibit "H"* hereto and incorporated herein by this reference.

18.    As of the date of this Complaint, Defendant CAROLINA has refused to take possession of the Premises or to perform its obligations under the Sublease.

19.    Pursuant to Section 6.3 of the Sublease, the terms, conditions and respective obligations of Plaintiff STATER and Defendant CAROLINA to each other under the Sublease shall be the terms and conditions of the Master Lease except for those provisions of the Master Lease which are directly contradicted by the Sublease.

20.    Pursuant to Sections 18.1 and 18.1.1 of the Master Lease, Defendant CAROLINA's failure to pay when due constitutes an event of default.

21.    In March 2018, Defendant CAROLINA placed a stop payment on its check to Plaintiff STATER in the amount of $64,209.60, for the monthly Base Rent and Security Deposit due and payable on March 1, 2018.

22.    As of the date of this Complaint, Defendant CAROLINA has failed and refused, despite demand by Plaintiff STATER, to pay the monthly Base Rent of $32,104.80 and the Security Deposit of $32,104.80, as required under the Sublease.

23.    Due to Defendant CAROLINA's failure to pay the monthly Base Rent of $32,104.80 and the Security Deposit of $32,104.80, as required under the Sublease, Defendant CAROLINA is in breach and default of the terms, conditions and obligations of the Sublease.

24.    Pursuant to Section 19.1 of the Master Lease, upon any event of default, Plaintiff STATER is entitled to terminate the Sublease and Defendant CAROLINA's right to possession of the Premises and to recover damages for Defendant CAROLINA's breach.

25.    Due to Defendant CAROLINA's default and breach of the Sublease, as set forth above, Plaintiff STATER hereby terminates Defendant CAROLINA's right of possession under the Sublease, in accordance with Section 19.1.1 of the Master Lease.

26.    Plaintiff STATER has performed all of the conditions, obligations, and covenants to be performed by Plaintiff STATER under the Sublease, except insofar as performance thereof has been excused by reason of the breaches of Defendant CAROLINA.

27.    On the date the Sublease was terminated as set forth above, rent due, owing, and unpaid by Defendant CAROLINA to Plaintiff STATER was $32,104.80.

COMPLAINT

28.   As a further proximate result of the default and breach of the Sublease by Defendant CAROLINA, Plaintiff STATER, including in an effort to relet the Premises and mitigate damages, has incurred and will incur additional expenses for, among other things, advertising and brokerage fees, all in an amount to be proven at trial.

29.   Section 11 of the Sublease provides for an award of reasonable attorneys' fees and all other fees, costs and expenses, to the party prevailing in any action or proceeding instituted between the parties concerning the Sublease.

**WHEREFORE**, Plaintiff STATER prays for judgment against Defendant CAROLINA as follows:

A. The Worth at the Time of Award of the unpaid rent which had been earned at the time of termination, plus interest as provided in the Master Lease;

B. The Worth at the Time of Award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rent loss that Defendant CAROLINA affirmatively proves could have been reasonably avoided, plus interest as provided in the Master Lease;

C. The Worth at the Time of Award of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of such rent loss that Defendant CAROLINA affirmatively proves could be reasonably avoided, plus interest as provided in the Master Lease;

D. Any other amount necessary to compensate Plaintiff STATER for all the detriment either proximately caused by Defendant CAROLINA's failure to perform Defendant CAROLINA's obligations under this Lease or which in the ordinary course of things would be likely to result therefrom;

E. All such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time under applicable law;

F. Reasonable attorneys' fees according to proof, and as provided by Section 11 of the Sublease;

G. Costs as provided by Section 11 of the Sublease;

6.

1    H.  For costs of suit incurred herein; and

2    I.  For such other and further relief as the Court may deem just and proper.

3

4    Dated: _3-23_____, 2018.        VARNER & BRANDT, LLP

5

6                                      By: _____

7                                          Brendan W. Brandt
                                           Attorneys for Plaintiff
8                                          STATER BROS. MARKETS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7.

COMPLAINT

800-422-9191
www.proindexes.com

TREEHUGGER™
30% PCW RECYCLED TAB
A Professional Indexes & Files Product

**EXHIBIT  A**

ORIGINAL

LANDLORD

GROSS LEASE (MODIFIED)

MOUNTAIN VIEW INDUSTRIAL CENTER, LLC,

Landlord,

and

STATER BROS. MARKETS,

Tenant

1450 Mountain View Avenue
Redlands, CA 92374
(Building 3)

01/07/2009 (v5)

## GROSS LEASE (MODIFIED)

### REFERENCE PAGES

**PROJECT:** Mountain View Industrial Center – Comprised of six (6) freestanding industrial buildings containing 707,810 square feet of rentable area, located at the northeast corner of Mountain View Avenue and Lugonia Avenue, Redlands, CA 92374

**LANDLORD:** Mountain View Industrial Center, LLC, a Delaware limited liability company

**LANDLORD'S ADDRESS:** c/o PGP Partners, Inc., 21068 Bake Parkway, Suite 200, Lake Forest, CA 92630

**LEASE REFERENCE DATE:** January 9, 2009

**TENANT:** Stater Bros. Markets, a California corporation

**TENANT'S NOTICE ADDRESS:** 1450 Mountain View Avenue
Redlands, CA  92374
Attn:  Director of Real Estate

-and-

301 South Tippecanoe Avenue
San Bernardino, California 92408
Attn:  Director of Real Estate

**PREMISES:** Approximately 65,520 square feet of space within a one-story industrial building with a street address of 1450 Mountain View Avenue, Redlands, CA 92374 (also known as Building 3) ("Building"), a fenced truck court and 38 parking spaces adjacent to the Building, as more particularly shown on Exhibit A attached hereto.

**BUILDING FOOTPRINT (SQ. FT.):** Approximately 99,580 square feet (for outline of Building see Exhibit A)

**TENANT'S SHARE:** 9.24%

**USE:** Warehousing, records and equipment storage, and related administrative office uses.

**ANTICIPATED COMMENCEMENT DATE:** January 9, 2009

**LEASE TERM:** One Hundred Twenty (120) months and twenty-two (22) days beginning on the Commencement Date and ending on the Termination Date.

**TERMINATION DATE:** January 31, 2019.

RENT (Article 3):

| Period | | Rentable Square | Annual Rate | | |
|---|---|---|---|---|---|
| from | through | Footage | Per Square Foot | Monthly Rent | Annual Rent |
| 1/9/2009 | 1/31/2010 | 65,520 | $1.07 | $5,831.28 | $69,975.36 |
| 2/1/2010 | 1/31/2011 | 65,520 | $4.19 | $22,866.48 | $274,397.76 |
| 2/1/2011 | 1/31/2012 | 65,520 | $4.43 | $24,176.88 | $290,122.56 |
| 2/1/2012 | 1/31/2013 | 65,520 | $4.91 | $26,797.68 | $321,572.16 |
| 2/1/2013 | 1/31/2014 | 65,520 | $5.15 | $28,108.08 | $337,296.96 |
| 2/1/2014 | 1/31/2015 | 65,520 | $5.63 | $30,728.88 | $368,746.56 |
| 2/1/2015 | 1/31/2016 | 65,520 | $5.87 | $32,039.28 | $384,471.36 |
| 2/1/2016 | 1/31/2017 | 65,520 | $6.11 | $33,349.68 | $400,196.16 |
| 2/1/2017 | 1/31/2018 | 65,520 | $6.35 | $34,660.08 | $415,920.96 |
| 2/1/2018 | 1/31/2019 | 65,520 | $6.59 | $35,970.48 | $431,645.76 |

SECURITY DEPOSIT:                           None.

ASSIGNMENT/SUBLETTING FEE           $1,000.00

DUE ON EXECUTION                           $22,866.48 (one month's Rent for the 13th month of the
                                                                 Lease).

BROKERS                                          Landlord's Broker:  Lee & Associates
                                                                           (Herrick Johnson/Vince Anthony)
                                                Tenant's Broker:   Lee & Associates
                                                                           (Joe McKay/Chris Morrell)

The Reference Pages information is incorporated into and made a part of the Lease. In the event of any conflict between any
Reference Pages information and the Lease, the Lease shall control. This Lease includes Exhibits A through D, all of which
are made a part of this Lease.

LANDLORD:                                              TENANT:

MOUNTAIN VIEW INDUSTRIAL CENTER, LLC,    STATER BROS. MARKETS,
a Delaware limited liability company                 a California corporation

By:      CalSMART L.L.C., a Delaware limited
         liability company, acting with respect to its
         Series C of limited liability company interests
         Its Manager                                     By:  _____
                                                                  Jack H. Brown
         By:  RREEF America L.L.C.,                       Chairman of the Board
              a Delaware limited liability company       and Chief Executive Officer
              Its Manager
              By:  _____
                   Ashley Powell   Mark English          By:  _____
                   Managing Director  Vice Presid.            Mike Slaton
                                                              Senior Director of Real Estate

Dated:  Feb. 12, 2009                               Dated:  _____

                                                              | | NE |
                                                              |---|---|
                                                              Initials

01/07/2009 (v5)

## TABLE OF CONTENTS

1.   USE AND RESTRICTIONS ON USE...............................................................1
2.   TERM.........................................................................................................1
3.   RENT..........................................................................................................2
4.   ANNUAL INCREASE...............................................................................2
5.   INTENTIONALLY DELETED..................................................................4
6.   ALTERATIONS.........................................................................................4
7.   REPAIR......................................................................................................5
8.   LIENS.........................................................................................................5
9.   ASSIGNMENT AND SUBLETTING.......................................................6
10.  INDEMNIFICATION................................................................................7
11.  INSURANCE..............................................................................................8
12.  WAIVER OF SUBROGATION.................................................................8
13.  SERVICES AND UTILITIES...................................................................8
14.  HOLDING OVER........................................................................................8
15.  SUBORDINATION.....................................................................................8
16.  RULES AND REGULATIONS.................................................................9
17.  REENTRY BY LANDLORD.....................................................................9
18.  DEFAULT...................................................................................................9
19.  REMEDIES...............................................................................................10
20.  TENANT'S BANKRUPTCY OR INSOLVENCY...................................11
21.  QUIET ENJOYMENT..............................................................................12
22.  CASUALTY................................................................................................12
23.  EMINENT DOMAIN................................................................................13
24.  SALE BY LANDLORD............................................................................13
25.  ESTOPPEL CERTIFICATES..................................................................13
26.  SURRENDER OF PREMISES.................................................................14
27.  NOTICES...................................................................................................14
28.  TAXES PAYABLE BY TENANT..............................................................14
29.  DEFINED TERMS AND HEADINGS.....................................................15
30.  TENANT'S AUTHORITY........................................................................15
31.  FINANCIAL STATEMENTS AND CREDIT REPORTS.......................15
32.  COMMISSIONS.......................................................................................15
33.  TIME AND APPLICABLE LAW..............................................................15
34.  SUCCESSORS AND ASSIGNS..............................................................15
35.  ENTIRE AGREEMENT...........................................................................16
36.  EXAMINATION NOT OPTION...............................................................16
37.  RECORDATION.......................................................................................16
38.  LIMITATION OF LANDLORD'S LIABILITY.......................................16

EXHIBIT A – PRELIMINARY SPACE PLAN
EXHIBIT B – TENANT IMPROVEMENTS
EXHIBIT C – COMMENCEMENT DATE MEMORANDUM
EXHIBIT D – RULES AND REGULATIONS


Initials

01/07/2009 (v5)

# GROSS LEASE (MODIFIED)

By this Gross Lease (Modified) (hereinafter, "Lease"), Landlord leases to Tenant and Tenant leases from Landlord the "Premises" described on the Reference Pages. The Reference Pages, including all terms defined thereon, are incorporated as part of this Lease.

## 1.    USE AND RESTRICTIONS ON USE.

1.1    Tenant shall use the Premises solely for the purposes set forth on the Reference Pages. Tenant shall not do or permit anything to be done in or about the Premises or the Project which will in any way obstruct or interfere with the rights of other tenants or occupants in the Project or injure, annoy, or disturb them, or allow the Building to be used for any improper, immoral, unlawful, or objectionable purpose, or commit any waste. Tenant shall comply with all governmental laws, ordinances and regulations applicable to Tenant's use and occupancy of the Premises and shall promptly comply with all governmental orders and directions for the correction, prevention and abatement of any violations in the Project or appurtenant land, caused or permitted by, or resulting from the specific use by, Tenant, or in or upon, or in connection with, the Premises, all at Tenant's sole expense. Tenant shall not do or permit anything to be done on or about the Premises or bring or keep anything into the Premises which will in any way increase the rate of, invalidate or prevent the procuring of any insurance protecting against loss or damage to the Premises or the Project due to fire or other casualty or against liability for damage to property or injury to persons. Landlord reserves the right to use the roof and exterior walls and grounds of the Premises, without payment to Tenant, for any purpose which does not materially interfere with Tenant's use and enjoyment of the Premises; provided, however, that Landlord will not use the roof or exterior walls for advertising purposes without Tenant's prior approval, which shall not be unreasonably withheld, conditioned or delayed.

1.2    Tenant shall not, and shall not direct, suffer or permit any of its agents, contractors, employees, licensees or invitees (collectively, the "Tenant Entities") to at any time handle, use, manufacture, store or dispose of in or about the Building or the Project any of the following (collectively "Hazardous Materials"): flammables, explosives, radioactive materials, hazardous wastes or materials, toxic wastes or materials, or other similar substances, petroleum products or derivatives or any substance subject to regulation by or under any federal, state and local laws and ordinances relating to the protection of the environment or the keeping, use or disposition of environmentally hazardous materials, substances, or wastes, presently in effect or hereafter adopted, all amendments to any of them, and all rules and regulations issued pursuant to any of such laws or ordinances (collectively "Environmental Laws"), nor shall Tenant suffer or permit any Hazardous Materials to be used in any manner not fully in compliance with all Environmental Laws, in the Building or the Project and appurtenant land or allow the environment to become contaminated with any Hazardous Materials. Notwithstanding the foregoing, Tenant may handle, store, use or dispose of products containing small quantities of Hazardous Materials (such as aerosol cans containing insecticides, toner for copiers, paints, paint remover and the like) to the extent customary and necessary for general office and warehouse purposes, including propane in appropriate containers as necessary for Tenant's operation of propane powered vehicles in connection with Tenant's business operations; provided that Tenant shall always handle, store, use, and dispose of any such Hazardous Materials in a safe and lawful manner and never allow such Hazardous Materials to contaminate the Premises, the Project and/or appurtenant land or the environment. Tenant shall protect, defend, indemnify and hold each and all of the Landlord Entities (as defined in Article 29) harmless from and against any and all loss, claims, liability or costs (including court costs and attorney's fees) incurred by reason of any actual or asserted failure of Tenant to fully comply with all applicable Environmental Laws, or the presence, handling, use or disposition in or from the Premises of any Hazardous Materials by Tenant or any Tenant Entities (even though permissible under all applicable Environmental Laws or the provisions of this Lease), or by reason of any actual or asserted failure of Tenant to keep, observe, or perform any provision of this Section 1.2.

1.3    The maximum weight capacity (static) of the dock levelers in the loading dock area is thirty thousand (30,000) pounds per dock leveler. Tenant shall not exceed this weight capacity limitation and must notify its employees, agents and contractors thereof. Tenant must indemnify, defend and hold Landlord harmless from any claims, damages or liabilities arising from Tenant's violation of this weight capacity limitation, including property damage or personal injury.

## 2.    TERM.

2.1    The Lease Term shall begin on the "Commencement Date" as shown on the Reference Pages and shall terminate on the "Termination Date" as shown on the Reference Pages, unless sooner terminated by the provisions of this Lease. Landlord shall tender possession of the Premises with "Tenant Improvements" described in Exhibit B attached hereto substantially completed. Tenant shall deliver a punch list of items not completed within thirty (30) days after Landlord tenders possession of the Premises and Landlord agrees to proceed with due diligence to perform its obligations regarding such items. Tenant shall, at Landlord's request, execute and deliver a memorandum of agreement provided by Landlord in

the form of Exhibit C attached hereto, setting forth the actual Commencement Date, Termination Date and, if necessary, a revised Rent schedule. Should Tenant fail to do so within thirty (30) days after Landlord's request, the information set forth in such memorandum provided by Landlord shall be conclusively presumed to be agreed and correct.

2.2     Tenant may enter the Premises up to thirty (30) days prior to the anticipated Commencement Date for the limited purpose of installing furniture, fixtures, equipment and moving records and inventory into the Premises, subject to the terms of this Section 2.3. If Tenant exercises the foregoing right to occupy the Premises prior to the Commencement Date, (a) Tenant shall be bound by and must comply with all provisions of this Lease, including without limitation, Tenant's compliance with the insurance requirements of Article 11, but excluding the obligation to pay Rent, (b) Tenant must not interfere with, obstruct or delay Landlord's construction of the Tenant Improvements, and (c) Tenant shall indemnify, defend, protect and hold Landlord and the Premises harmless from and against all liens, liabilities, losses, damages, costs, expenses, demands, actions, causes of action and claims (including, without limitation, attorneys' fees and costs) arising out of Tenant's agents, employees, contractors and representatives ("Tenant Parties") early occupancy of the Premises prior to the Commencement Date. Said early possession shall not advance the Termination Date.

## 3.     RENT.

3.1     Tenant agrees to pay to Landlord, without deduction or offset and without notice or demand, each monthly installment of "Rent" per the schedule shown in the Reference Pages on or before the first day of each full calendar month during the Lease Term. As an inducement for Tenant's execution of this Lease, Tenant acknowledges that Landlord has agreed to abate Rent for the first twelve months of the Lease Term in the amount of $2.88 per rentable square foot per annum. Upon the execution of this Lease, Tenant shall deliver to Landlord one month's installment of Rent for the 13th month of the Lease Term in the amount of $22,866.48. Rent for any month during the Lease Term which is less than a full month shall be prorated based upon the number of days in such month. Tenant shall deliver payments of Rent to Landlord at the Rent Payment Address set forth on the Reference Pages, or to such other person or at such other place as Landlord may from time to time designate in writing. If an Event of Default occurs, Landlord may, upon written notice to Tenant, require that all subsequent Rent payments be made by an automatic payment from Tenant's bank account to Landlord's account, at Tenant's cost. Tenant must implement such automatic payment system prior to the later of (a) the date that the next scheduled Rent payment is due, or (b) within ten (10) days after Tenant receives written notice from Landlord. The term "Rent" as used herein shall include the "Rent" per the schedule shown in the Reference Pages, the "Annual Increase" (as defined below) and all other amounts and sums payable by Tenant to Landlord hereunder.

3.2     Tenant recognizes that late payment of any Rent or other sum due under this Lease will result in administrative expense to Landlord, the extent of which additional expense is extremely difficult and economically impractical to ascertain. Tenant therefore agrees that if Rent or any other sum is not paid within five (5) days of the due date pursuant to this Lease, a late charge shall be imposed in an amount equal to the greater of: (a) One Hundred Fifty Dollars ($150.00), or (b) five percent (5%) of the unpaid Rent or other sum due. The amount of the late charge to be paid by Tenant shall be reassessed and added to Tenant's obligation for each successive month until paid. The provisions of this Section 3.2 do not relieve Tenant of the obligation to pay Rent or other sums owing on or before the date due, nor do the terms of this Section 3.2 in any way affect Landlord's remedies pursuant to Article 19 of this Lease. Notwithstanding the foregoing, there shall be no late charge imposed for the first past due Rent payment in each twenty-four (24) month period during the Lease Term, provided that such past due Rent payment is cured by Tenant within the applicable notice and cure period.

## 4.     ANNUAL INCREASE.

4.1     Payment of Annual Increase. In addition to the Rent per the schedule in the Reference Pages, Tenant shall pay to Landlord the Annual Increase (as defined in Section 4.2.1 below) in accordance with the provisions of this Section 4. Landlord shall be entitled to exercise the same rights and remedies with respect to Tenant's defaults in the payment of the Annual Increase as Landlord is entitled to exercise with respect to Tenant's defaults in the payment of Rent.

4.2     Defined Terms. For purposes of this Article 4, the following terms and definitions shall apply:

4.2.1     "Annual Increase" means any Building Cost Increase plus Tenant's Share of any Project Cost Increase, as those terms are defined and provided in this Article 4.

4.2.2     "Building Cost Increase" means (i) any increase in the amount of Operating Costs and Utilities Costs incurred by Landlord with respect to the Building in each subsequent year of the Lease Term over and above the



Initials

amount of such costs incurred by Landlord during the first year of the Lease Term (such increase not to exceed 5% year over year), and (ii) any increase in the amount of Insurance Costs and Tax Costs incurred by Landlord with respect to the Building in each subsequent year of the Lease Term over and above the amount of such costs incurred by Landlord during the first year of the Lease Term. Any Building Cost Increase attributable to a period of time not entirely within the Lease Term shall be prorated based on the actual number of days in the applicable period.

      4.2.3    "Insurance Costs" means all costs of fire, extended coverage, boiler, sprinkler, public liability, property damage, rent, earthquake and other insurance maintained by Landlord for the Building, and any of its contents, all as reasonably determined by Landlord or as may be required by any mortgagees of the Project.

      4.2.4    "Operating Costs" means, but is not limited to, the following costs and expenses incurred by Landlord in connection with the maintenance, operation and repair of the Building and/or the Project, as applicable: salaries, wages, payroll taxes, fringe benefits, employment taxes, workers' compensation, uniforms and dry cleaning thereof for all persons who perform duties connected with the operation, maintenance and repair of the Project (including operating engineers, but specifically excluding security services and day porters), including walkways and landscaped areas, common area janitorial, gardening, slurry coating of parking areas, re-painting the exterior of the Building, carpentry, hired services, personal property taxes on property used for maintenance and operations, fees, costs, expenses or dues payable pursuant to the terms of any covenants, conditions or restrictions or owners' association, capital expenditures and repairs (amortized over their useful lives as determined by generally accepted accounting principles); the cost of all building and cleaning supplies and materials; the cost of all charges for cleaning, maintenance and service contracts and other services with independent contractors and administration fees; Landlord's management fee for the Project (not to exceed five percent (5%) of Landlord's gross rents received from tenants in the Project); and any license, permit and inspection fees. During any calendar year, if the total rentable square feet of floor space in the Project is less than 95% occupied at all times, Operating Costs shall be adjusted as though 95% of the rentable square feet of floor space in the Project were occupied at all times, and the increase or decrease in the sums owed hereunder shall be based upon such Operating Costs as so adjusted. Such gross up adjustments shall be made by Landlord by increasing those costs included in the Operating Costs which, according to industry practice but depending on the specific situation of the Building and/or Project, vary based upon the level of occupancy of the Building and/or Project. Operating Costs shall not include depreciation or amortization of the Building or equipment in the Building except as provided herein, loan principal payments, costs of alterations of tenants' premises, leasing commissions, interest expenses on long-term borrowings or advertising costs.

      4.2.5    "Project Cost Increase" means (i) any increase in the amount of Operating Costs and Utilities Costs incurred by Landlord with respect to the Project as a whole in each subsequent year of the Lease Term over and above the amount of such costs incurred by Landlord during the first year of the Lease Term (such increase not to exceed 5% year over year), and (ii) any increase in the amount of Insurance Costs and Tax Costs incurred by Landlord with respect to the Project as a whole in each subsequent year of the Lease Term over and above the amount of such costs incurred by Landlord during the first year of the Lease Term. Any Project Cost Increase attributable to a period of time not entirely within the Lease Term shall be prorated based on the actual number of days in the applicable period.

      4.2.6    "Tax Costs" means any and all real estate taxes, assessments, and all other charges assessed, reassessed, or levied upon the Project and appurtenances thereto (including without limitation, any and all community facilities and lighting maintenance district assessments and the annual inflationary increase of real estate taxes statutorily permitted under Proposition 13), or the rents, issues, profits or income Landlord receives or derives from the Project (which may be collected by the United States, the State of California, or any local government authority or agency or any political subdivision thereof), or upon this transaction or any contract or instrument creating or transferring an interest or an estate in the Premises to which Tenant is a party. Notwithstanding the foregoing, Tax Costs shall not include excess profits taxes, franchise taxes, gift taxes, capital stock taxes, inheritance and succession taxes, estate taxes, and federal and state income taxes to the extent applicable to Landlord's general or net income (as opposed to rents, receipts or income attributable to operations at the Project).

      4.2.7    "Tenant's Share" is identified in the Reference Pages and is calculated by dividing the square feet of rentable area in the Premises by the total square feet of rentable area in the Project (as set forth in the Reference Pages). If the rentable area in the Premises and/or the Project changes, Tenant's Share shall be appropriately adjusted on a go forward basis.

      4.2.8    "Utilities Costs" means all actual charges for utilities for the Building and/or the Project incurred by Landlord, including, but not limited to, the costs of water, sewer and electricity, trash removal services and the costs of



Initials

-3-

HVAC and other utilities (but excluding those charges for which any tenant in the Project directly reimburses Landlord or pays directly to the utility company) as well as related fees, assessments and surcharges. Utilities Costs shall include any costs of utilities allocated to the Project under any declaration, restrictive covenant, or other instrument pertaining to the sharing of costs by the Project or any portion thereof, including any covenants, conditions or restrictions now or hereafter recorded against or affecting the Project. Notwithstanding the foregoing to the contrary, Utilities Costs shall not include any penalties, interest, late charges or other costs of any kind attributable to Landlord's delinquent payment thereof.

   4.3    Estimate Statement.  In each subsequent year after the first year of the Lease Term, Landlord shall give Tenant an annual estimated statement ("Estimate Statement") setting forth Landlord's reasonable estimate of the total Annual Increase for the following calendar year ("Estimated Annual Increase").  The failure of Landlord to timely furnish the Estimate Statement for any calendar year shall not preclude Landlord from subsequently enforcing its rights to collect any Annual Increase under this Section 4.3, once such Estimated Annual Increase has been determined by Landlord.  Tenant shall pay, with its next installment of monthly Rent due, 1/12th of the Estimated Annual Increase.  If Landlord does not provide a new Estimate Statement in any subsequent year, Tenant shall continue to pay 1/12th of the Estimated Annual Increase set forth in the Estimate Statement for the previous calendar year.

   4.4    Actual Statement.  Within 120 days of the end of each calendar year during the Lease Term, Landlord will deliver to Tenant a statement ("Actual Statement") setting forth the actual Annual Increase ("Actual Annual Increase").  If the Actual Statement confirms that the Actual Annual Increase shown thereon is more than the Estimated Annual Increase paid by Tenant for the preceding calendar year, Tenant must pay the difference between the Actual Annual Increase less the Estimated Annual Increase paid by Tenant for the prior calendar year ("Underpayment") with the next installment of monthly Rent due.  If the Actual Statement confirms that the Actual Annual Increase is less than the Estimated Annual Increase paid by Tenant for the preceding calendar year, Tenant will be credited the difference between the Estimated Annual Increase paid by Tenant for the prior calendar year less the Actual Annual Increase ("Overpayment") against the next installments of Rent payable by Tenant.  The failure of Landlord to timely furnish the Actual Statement for any calendar year shall not prejudice Landlord from enforcing its rights under this Section 4.4 after the Actual Statement has been delivered to Tenant.  After the expiration or earlier termination of the Lease Term and Tenant's surrender of the Premises, (i) if an Underpayment exists at that time, Tenant shall pay to Landlord the Underpayment within 30 days of Landlord's demand for payment thereof, or (ii) if an Overpayment exists at that time, Landlord shall pay to Tenant the Overpayment within 30 days of Tenant's demand for payment thereof.  The provisions of this Section 4.4 survive the expiration or earlier termination of this Lease.

5.     INTENTIONALLY DELETED.

6.     ALTERATIONS.

   6.1    Except for those, if any, specifically provided for in Exhibit B to this Lease, Tenant shall not make or suffer to be made any alterations, additions, or improvements, including, but not limited to, the attachment of any fixtures or equipment in, on, or to the Premises or any part thereof or the making of any improvements as required by Article 7, without the prior written consent of Landlord.  When applying for such consent, Tenant shall, if requested by Landlord, furnish complete plans and specifications for such alterations, additions and improvements.  Landlord's consent shall not be unreasonably withheld, conditioned or delayed with respect to alterations which (i) are not structural in nature, (ii) are not visible from the exterior of the Building, (iii) do not affect or require modification of the Building's electrical, mechanical, plumbing, HVAC or other systems, and (iv) in aggregate do not cost more than $5.00 per rentable square foot of that portion of the Premises affected by the alterations in question.

   6.2    If Landlord consents to the making of any such alteration, addition or improvement by Tenant, the same shall be made by using either Landlord's contractor or a contractor reasonably approved by Landlord, in either event at Tenant's sole cost and expense.  If Tenant hires any contractor other than Landlord's contractor and such other contractor or any subcontractor of such other contractor hires any non-union labor or supplier, Tenant shall be responsible for and hold Landlord harmless from any and all delays, damages and extra costs suffered by Landlord as a result of any dispute with any labor unions concerning the wage, hours, terms or conditions of the employment of any such labor.  Tenant must pay Landlord a construction management fee not to exceed five percent (5%) of the cost of such proposed work plus third-party costs actually incurred by Landlord in connection with the proposed work and the design thereof, with all such amounts being due within five (5) days of Landlord's demand for payment thereof.

   6.3    All alterations, additions or improvements proposed by Tenant shall be constructed in accordance with all government laws, ordinances, rules and regulations, using Building standard materials where applicable, and Tenant shall,

01/07/2009 (v5)

Initials    ME

prior to construction, provide the additional insurance required under Article 11. In addition, Tenant shall provide all such assurances reasonably required by Landlord to assure payment of the costs thereof, including but not limited to, notices of non-responsibility, waivers of lien, surety company performance bonds and funded construction escrows to protect Landlord, the Building, the Project and appurtenant land against any loss from any mechanic's, materialmen's or other liens. Landlord may, as a condition to its consent to any particular alterations or improvements, require that Tenant deposit with Landlord an amount reasonably estimated by Landlord as sufficient to cover the cost of removing such alterations or improvements and restoring the Premises, to the extent required under Section 26.2.

7.     REPAIR.

        7.1     Except as set forth in Exhibit B and in this section, Landlord shall have no obligation to alter, remodel, improve, repair, decorate or paint the Premises. By taking possession of the Premises, Tenant accepts them as being in good order, condition and repair and in the condition in which Landlord is obligated to deliver them, except as set forth in the punch list to be delivered pursuant to Section 2.1. Tenant acknowledges and agrees that Landlord has not made any express or implied representations respecting the condition of the Premises or the Building, except as specifically set forth in this Lease. Landlord shall not be liable for any failure to make any repairs or to perform any maintenance unless such failure shall persist for an unreasonable time after written notice of the need of such repairs or maintenance is given to Landlord by Tenant. Notwithstanding anything herein to the contrary, Landlord shall maintain, repair and replace the common areas in the Project (including landscaping and slurry coating parking areas), the fire-life-safety system serving the Building (including the fire sprinkler, fire alarm system, diesel backup generator and periodic testing of the system), and make any necessary capital repairs (including necessary improvements for adequate operation of such systems) and replacements of the heating and air conditioning systems, electrical systems and plumbing systems for the Building ("Building Systems") and the structural portions of the Building ("Structural Improvements").

        7.2     Tenant shall at its own cost and expense keep and maintain all parts of the Premises (including all fixtures and equipment installed by Tenant in the Premises) in broom clean and good condition, reasonable wear and tear and loss by fire or other casualty excepted. Except as provided in Section 7.4 below, Tenant shall promptly make all necessary routine repairs to the Premises (excluding capital repairs or replacements of the Building Systems or Structural Improvements) with materials and workmanship of the same character, kind and quality as the original, including routine maintenance (on a monthly, quarterly and/or annual basis, as appropriate) of the water heaters serving the Premises, windows, glass and plate glass, doors, skylights, any special office entries, interior walls and finish work, floors and floor coverings, Building Systems, dock boards, truck doors, dock bumpers, parking lot and driveway sweeping, truck court fence repair and regular removal of trash and debris. Upon termination of this Lease, Tenant will deliver the Premises to Landlord in broom clean condition, ordinary wear and tear and loss by fire or other casualty excepted), but not excepting any damage to glass and any non-capital repairs due to deferred routine maintenance to the Building Systems, Structural Improvements and exterior of the Building (including graffiti removal, minor paint touch-up, outside lighting and minor roof leaks). If Tenant fails to adequately maintain the Premises as provided in this Section 7.2, Landlord may notify Tenant of such failure in writing and demand that Tenant cure such failure within thirty (30) days of Tenant's receipt of such written notice. If Tenant does not cure such failure within such thirty-day time period, Landlord shall have the right to undertake such maintenance on behalf of Tenant and charge the cost thereof to Tenant, payable within thirty (30) days of Tenant's receipt of an invoice from Landlord.

        7.3     Except as provided in Article 22, there shall be no abatement of rent and no liability of Landlord by reason of any injury to or interference with Tenant's business arising from the making of any repairs, alterations or improvements in or to any portion of the Building or the Premises or to fixtures, appurtenances and equipment in the Building, provided, however, Landlord shall not commence any repairs which may have any impact on Tenant's business or use of the Premises without giving Tenant three (3) days advanced written notice and Landlord shall use its commercially reasonable efforts to minimize any such impacts. Tenant hereby waives any and all rights under and benefits of subsection 1 of Section 1932 and Sections 1941 and 1942 of the California Civil Code, or any similar or successor Regulations or other laws now or hereinafter in effect.

        7.4     Tenant shall, at its own cost and expense, be responsible for regularly scheduled preventive maintenance and servicing of the Building Systems and the Building roof, including all preventative maintenance services suggested by the equipment and roof manufacturer in the operation/maintenance manual (if applicable) to ensure (i) the proper operation and longevity of the Building Systems, and (ii) the Building roof remains water-tight in accordance with the roof manufacturer's specifications (reasonable wear and tear and defects excluded). If Landlord approves the scope and schedule of such maintenance and servicing and such scope and schedule are followed and performed, Tenant shall be deemed in compliance with its obligations under this Section 7. Should Tenant fail to do so, Landlord may, upon notice to Tenant,

-5-

Initials

perform such preventative maintenance work and charge the cost thereof to Tenant along with a reasonable amount for Landlord's overhead, provided that any such costs incurred are reasonable and customary for the work performed in the Redlands, California market. If Landlord performs such preventative maintenance work, Landlord shall be responsible for any such work and Tenant's only obligation shall be to reimburse Landlord for the reasonable and customary costs associated therewith.

7.5     To the extent there are any warranties from contractors or suppliers with respect to the construction of the Building, Landlord agrees to either assign such warranties to Tenant or reasonably cooperate with Tenant to enforce warranty claims upon the occurrence or discovery of any defects or failures in the Building Systems or Structural Improvements that would be covered by such warranties.

8.     LIENS. Tenant shall keep the Premises, the Building and appurtenant land and Tenant's leasehold interest in the Premises free from any liens arising out of any services, work or materials performed, furnished, or contracted for by Tenant, or obligations incurred by Tenant. In the event that Tenant fails, within ten (10) days following the imposition of any such lien, to either cause the same to be released of record or provide Landlord with insurance against the same issued by a major title insurance company or such other protection against the same as Landlord shall accept (such failure to constitute an Event of Default), Landlord shall have the right to cause the same to be released by such means as it shall deem proper, including payment of the claim giving rise to such lien. All such sums paid by Landlord and all expenses incurred by it in connection therewith shall be payable to it by Tenant within five (5) days of Landlord's demand for payment thereof.

9.     ASSIGNMENT AND SUBLETTING.

9.1     Except for an assignment or sublease to an affiliate of Tenant or to an entity owned, at least in part, by Tenant, Tenant shall not have the right to assign or pledge this Lease or to sublet the whole or any part of the Premises whether voluntarily or by operation of law, or permit the use or occupancy of the Premises by anyone other than Tenant, and shall not make, suffer or permit such assignment, subleasing or occupancy without the prior written consent of Landlord, such consent not to be unreasonably withheld, conditioned or delayed, and said restrictions shall be binding upon any and all assignees of the Lease and subtenants of the Premises. If Tenant desires to sublet, or permit such occupancy of, the Premises, or any portion thereof, or assign this Lease, Tenant shall give written notice thereof to Landlord at least thirty (30) days but no more than one hundred twenty (120) days prior to the proposed commencement date of such subletting or assignment, which notice shall set forth the name of the proposed subtenant or assignee, the relevant terms of any sublease or assignment and copies of financial reports and other relevant financial information of the proposed subtenant or assignee.

9.2     Notwithstanding any assignment or subletting, permitted or otherwise, Tenant shall at all times remain directly, primarily and fully responsible and liable for the payment of the rent specified in this Lease and for compliance with all of its other obligations under the terms, provisions and covenants of this Lease. Upon the occurrence of an Event of Default, if the Premises or any part of them are then assigned or sublet, Landlord, in addition to any other remedies provided in this Lease or provided by law, may, at its option, collect directly from such assignee or subtenant all rents due and becoming due to Tenant under such assignment or sublease and apply such rent against any sums due to Landlord from Tenant under this Lease, and no such collection shall be construed to constitute a novation or release of Tenant from the further performance of Tenant's obligations under this Lease.

9.3     In addition to Landlord's right to approve of any subtenant or assignee, Landlord shall have the option, in its sole discretion, in the event of any proposed subletting or assignment, to terminate this Lease, or in the case of a proposed subletting of less than the entire Premises, to recapture the portion of the Premises to be sublet, as of the date the subletting or assignment is to be effective. The option shall be exercised, if at all, by Landlord giving Tenant written notice given by Landlord to Tenant within thirty (30) days following Landlord's receipt of Tenant's written notice as required above. However, if Tenant notifies Landlord, within five (5) days after receipt of Landlord's termination notice, that Tenant is rescinding its proposed assignment or sublease, the termination notice shall be void and the Lease shall continue in full force and effect. If this Lease shall be terminated with respect to the entire Premises pursuant to this Section, the Lease Term shall end on the date stated in Tenant's notice as the effective date of the sublease or assignment as if that date had been originally fixed in this Lease for the expiration of the Lease Term. If Landlord recaptures under this Section only a portion of the Premises, the rent to be paid from time to time during the unexpired Lease Term shall abate proportionately based on the proportion by which the approximate square footage of the remaining portion of the Premises shall be less than that of the Premises as of the date immediately prior to such recapture. Tenant shall, at Tenant's own cost and expense, discharge in full any outstanding commission obligation which may be due and owing, excluding Landlord's brokers, as a result of any



Initials

-6-

proposed assignment or subletting, whether or not the Premises are recaptured pursuant to this Section and rented by Landlord to the proposed tenant or any other tenant.

9.4     If Tenant sells, sublets, assigns or transfers this Lease, Tenant shall pay to Landlord as additional rent an amount equal to fifty percent (50%) of any Increased Rent (as defined below), less the Costs Component (as defined below), when and as such Increased Rent is received by Tenant. As used in this Section, "Increased Rent" shall mean the excess of (i) all rent and other consideration which Tenant is entitled to receive by reason of any sale, sublease, assignment or other transfer of this Lease, over (ii) the rent otherwise payable by Tenant under this Lease at such time. For purposes of the foregoing, any consideration received by Tenant in form other than cash shall be valued at its fair market value as determined by Landlord in good faith. The "Costs Component" is that amount which, if paid monthly, would fully amortize on a straight-line basis, over the entire period for which Tenant is to receive Increased Rent, the reasonable costs incurred by Tenant for leasing commissions and tenant improvements in connection with such sublease, assignment or other transfer.

9.5     Notwithstanding any other provision hereof, it shall be considered reasonable for Landlord to withhold its consent to any assignment of this Lease or sublease of any portion of the Premises if at the time of either Tenant's notice of the proposed assignment or sublease or the proposed commencement date thereof, there shall exist any uncured default of Tenant or matter which will become a default of Tenant with passage of time unless cured, or if the proposed assignee or sublessee is an entity: (a) with which Landlord is already in negotiation; (b) which is already an occupant of the Building unless Landlord is unable to provide the amount of space required by such occupant; (c) which is a governmental agency; (d) which is incompatible with the character of occupancy of the Building; (e) which has insufficient financial net worth or lacks adequate credit worthiness as determined in Landlord's discretion; or (f) whose proposed use would (i) involve increased personnel or wear upon the Building; (ii) violate any exclusive right granted to another tenant of the Building; (iii) require any addition to or modification of the Premises or the Building in order to comply with building code or other governmental requirements; or, (iv) violate Section 1.2. Tenant expressly agrees that for the purposes of any statutory or other requirement of reasonableness on the part of Landlord, Landlord's refusal to consent to any assignment or sublease for any of the reasons described in this Section shall be conclusively deemed to be reasonable.

9.6     Upon any request to assign or sublet, Tenant will pay to Landlord the Assignment/Subletting Fee plus, on demand, a sum equal to all of Landlord's costs, including reasonable attorney's fees, incurred in investigating and considering any proposed or purported assignment or pledge of this Lease or sublease of any of the Premises, regardless of whether Landlord shall consent to, refuse consent, or determine that Landlord's consent is not required for, such assignment, pledge or sublease. Any purported sale, assignment, mortgage, transfer of this Lease or subletting which does not comply with the provisions of this Article 9 shall be void. The costs to be paid by Tenant under this Section 9.6 shall not exceed Three Thousand Dollars ($3,000.00).

9.7     Notwithstanding anything herein to the contrary, Tenant may assign its rights, duties and obligations under this Lease, or sublease all or any portion of the Premises, without Landlord's consent, to any entity which acquires a controlling interest in Tenant, or any entity in which Tenant acquires a controlling interest (whether by merger or consolidation) (each, a "Permitted Affiliate"), provided that (i) such assignment or sublet is not entered into as a subterfuge to avoid Tenant's duties and obligations under this Lease, (ii) the Tenant originally named in this Lease remains liable for all duties and obligations under this Lease notwithstanding the assignment or sublease, (iii) such assignment or sublease complies with any requirements of any lender of Landlord with a security interest in the Project, and (iv) Tenant must notify Landlord in writing of the proposed assignment or sublease and the identity of the Permitted Affiliate at least thirty (30) days prior to the effective date of the proposed assignment or sublease.

10.     **INDEMNIFICATION.** Tenant shall protect, indemnify and hold the Landlord Entities harmless from and against any and all loss, claims, liability or costs (including court costs and attorney's fees) incurred by reason of (a) any damage to any property (including but not limited to property of any Landlord Entity) or any injury (including but not limited to death) to any person occurring in, on or about the Premises to the extent that such injury or damage shall be caused by or arise from any actual or alleged act, neglect, fault, or omission by or of Tenant or any Tenant Entity to meet any standards imposed by any duty with respect to the injury or damage; (b) the conduct or management of any work or thing whatsoever done by the Tenant in or about the Premises or from transactions of the Tenant concerning the Premises; (c) Tenant's failure to comply with any and all governmental laws, ordinances and regulations applicable to the condition or use of the Premises or its occupancy, unless such failure to comply existed prior to Tenant's occupancy; or (d) any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of the Tenant to be performed pursuant to this Lease. The provisions of this Article shall survive the termination of this Lease with respect to any claims or liability accruing prior to such termination.

-7-

Initials

11.   **INSURANCE.**

**11.1**   Tenant shall keep in force throughout the Lease Term: (a) a Commercial General Liability insurance policy or policies to protect the Landlord Entities against any liability to the public or to any invitee of Tenant or a Landlord Entity incidental to the use of or resulting from any accident occurring in or upon the Premises with a limit of not less than $1,000,000 per occurrence and not less than $2,000,000 in the annual aggregate, and excess liability coverage of not less than $5,000,000.00 per occurrence, or such larger amount as Landlord may prudently require from time to time, covering bodily injury and property damage liability and $1,000,000 products/completed operations aggregate; (b) Business Auto Liability covering owned, non-owned and hired vehicles with a limit of not less than $1,000,000 per accident; (c) Worker's Compensation Laws with limits as required by statute and Employers Liability with limits of $500,000 each accident, $500,000 disease policy limit, $500,000 disease—each employee; and (d) All Risk or Special Form coverage protecting Tenant against loss of or damage to Tenant's alterations, additions, improvements, carpeting, floor coverings, panelings, decorations, fixtures, inventory and other business personal property situated in or about the Premises to the full replacement value of the property so insured.

**11.2**   The aforesaid policies shall (a) be provided at Tenant's expense; (b) name the Landlord Entities as additional insureds (General Liability) and loss payee (Property—Special Form); (c) be issued by an insurance company with a minimum Best's rating of "A-:VII" during the Lease Term; and (d) provide that Tenant shall endeavor to provide Landlord thirty (30) days prior written notice (ten days for non-payment of premium) of cancellation; a certificate of Liability insurance on ACORD Form 25 and a certificate of Property insurance on ACORD form 28 shall be delivered to Landlord by Tenant upon the Commencement Date.

**11.3**   Whenever Tenant shall undertake any alterations, additions or improvements in, to or about the Premises ("Work") the aforesaid insurance protection must extend to and include injuries to persons and damage to property arising in connection with such Work, without limitation including liability under any applicable structural work act, and such other insurance as Landlord shall require; and the policies of or certificates evidencing such insurance must be delivered to Landlord prior to the commencement of any such Work.

12.   **WAIVER OF SUBROGATION.**   So long as their respective insurers so permit, Tenant and Landlord hereby mutually waive their respective rights of recovery against each other for any loss insured by fire, extended coverage, All Risks or other insurance now or hereafter existing for the benefit of the respective party but only to the extent of the net insurance proceeds payable under such policies. Each party shall obtain any special endorsements required by their insurer to evidence compliance with the aforementioned waiver.

13.   **SERVICES AND UTILITIES.**   Tenant shall pay for all water, gas, heat, light, power, telephone, sewer, sprinkler system charges and other utilities and services used on or from the Premises, together with any taxes, penalties, and surcharges or the like pertaining thereto and any maintenance charges for utilities. Tenant shall furnish all electric light bulbs, tubes and ballasts, battery packs for emergency lighting and fire extinguishers.   Tenant will not, without the written consent of Landlord, contract with a utility provider to service the Premises with any utility, including, but not limited to, telecommunications, electricity, water, sewer or gas, which is not previously providing such service to the Building. Landlord shall in no event be liable for any interruption or failure of utility services on or to the Premises.

14.   **HOLDING OVER.**   If Tenant fails to surrender and vacate the Premises upon expiration or termination of this Lease (by lapse of time or otherwise), Tenant shall immediately be liable to Landlord for One Hundred Fifty Percent (150%) of the full monthly installment of Rent in effect for the last period prior to the date of such termination plus the full monthly installment of Annual Increase under Article 4 ("Holdover Rent"). Tenant shall be liable for the full monthly installment of Holdover Rent for each month that Tenant holds over (or portion thereof) even if Tenant holds over less than a full month or months (i.e., the Holdover Rent shall not be prorated by the number of days of Tenant's actual hold over period).   Tenant shall also pay all damages sustained by Landlord by reason of such retention, provided, however, Landlord must give Tenant thirty (30) days prior written notice that such holdover will cause Landlord to sustain damage. Any such holdover by Tenant shall be for a period from month to month.

15.   **SUBORDINATION.**   Without the necessity of any additional document being executed by Tenant for the purpose of effecting a subordination, this Lease shall be subject and subordinate at all times to ground or underlying leases and to the lien of any mortgages or deeds of trust now or hereafter placed on, against or affecting the Building, Landlord's interest or estate in the Building, or any ground or underlying lease; provided, however, that if the lessor, mortgagee, trustee, or holder of any such mortgage or deed of trust elects to have Tenant's interest in this Lease be superior to any such instrument, then,



Initials

-8-

by notice to Tenant, this Lease shall be deemed superior, whether this Lease was executed before or after said instrument. Notwithstanding the foregoing, Tenant covenants and agrees to execute and deliver within ten (10) days of Landlord's request such further instruments evidencing such subordination or superiority of this Lease as may be required by Landlord.

16.    **RULES AND REGULATIONS.** Tenant shall faithfully observe and comply with all the rules and regulations as set forth in Exhibit D to this Lease and all reasonable modifications of and additions to them from time to time put into effect by Landlord. Landlord shall not be responsible to Tenant for the non-performance by any other tenant or occupant of the Building of any such rules and regulations.

17.    **REENTRY BY LANDLORD.**

17.1    Landlord reserves and shall at all times have the right to re-enter the Premises as necessary to address emergency situations and to inspect the same, to show said Premises to prospective purchasers, mortgagees or tenants, and to alter, improve or repair the Premises and any portion of the Building, without abatement of rent and provided that the business of Tenant shall not be interfered with unreasonably. Landlord shall provide forty-eight (48) hours prior written notice (via fax or email) to Tenant before entering the Premises for non-emergency purposes. In the event of an emergency, Landlord shall only be required to provide Tenant with prior notice of entry to the extent feasible given the nature of the emergency. Landlord shall have the right at any time to change the name, number or designation by which the Building is commonly known; provided that Landlord will reimburse Tenant for any reasonable out-of-pocket costs actually incurred by Tenant as a result of Landlord's exercise of the foregoing right. Tenant hereby waives any claim for damages for any injury, inconvenience to, or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned by any action of Landlord authorized by this Article 17?.

17.2    Landlord shall have the right to use any and all means which Landlord may deem proper to open said doors in an emergency to obtain entry to any portion of the Premises. As to any portion to which access cannot be had by means of a key or keys in Landlord's possession, Landlord is authorized to gain access by such means as Landlord shall elect and the cost of repairing any damage occurring in doing so shall be borne by Landlord and paid to Tenant within five (5) days of Tenant's demand.

18.    **DEFAULT.**

18.1    Except as otherwise provided in Article 20, the following events shall be deemed to be Events of Default under this Lease:

18.1.1    Tenant shall fail to pay when due any sum of money becoming due to be paid to Landlord under this Lease, whether such sum be any installment of the rent reserved by this Lease, any other amount treated as additional rent under this Lease, or any other payment or reimbursement to Landlord required by this Lease, whether or not treated as additional rent under this Lease, and such failure shall continue for a period of five (5) business days after written notice that such payment was not made when due, but if any such notice shall be given, for the twelve (12) month period commencing with the date of such notice, the failure to pay within three (3) business days after due any additional sum of money becoming due to be paid to Landlord under this Lease during such period shall be an Event of Default, without notice. The notice required pursuant to this Section 18.1.1 shall replace rather than supplement any statutory notice required under California Code of Civil Procedure Section 1161 or any similar or successor statute.

18.1.2    Tenant shall fail to comply with any term, provision or covenant of this Lease which is not provided for in another Section of this Article and shall not cure such failure within twenty (20) days (forthwith, if the failure involves a hazardous condition) after written notice of such failure to Tenant provided, however, that such failure shall not be an event of default if such failure could not reasonably be cured during such twenty (20) day period, Tenant has commenced the cure within such twenty (20) day period and thereafter is diligently pursuing such cure to completion, but the total aggregate cure period shall not exceed ninety (90) days.

18.1.3    Tenant shall fail to vacate the Premises immediately upon termination of this Lease, by lapse of time or otherwise, or upon termination of Tenant's right to possession only.

18.1.4    Tenant shall become insolvent, admit in writing its inability to pay its debts generally as they become due, file a petition in bankruptcy or a petition to take advantage of any insolvency statute, make an assignment for the benefit of creditors, make a transfer in fraud of creditors, apply for or consent to the appointment of a receiver of itself or

-9-

Initials

of the whole or any substantial part of its property, or file a petition or answer seeking reorganization or arrangement under the federal bankruptcy laws, as now in effect or hereafter amended, or any other applicable law or statute of the United States or any state thereof.

18.1.5   A court of competent jurisdiction shall enter an order, judgment or decree adjudicating Tenant bankrupt, or appointing a receiver of Tenant, or of the whole or any substantial part of its property, without the consent of Tenant, or approving a petition filed against Tenant seeking reorganization or arrangement of Tenant under the bankruptcy laws of the United States, as now in effect or hereafter amended, or any state thereof, and such order, judgment or decree shall not be vacated or set aside or stayed within sixty (60) days from the date of entry thereof.

## 19.   REMEDIES.

19.1   Upon the occurrence of any Event or Events of Default under this Lease, Landlord shall have the option to pursue any one or more of the following remedies without any notice (except as expressly prescribed herein) or demand whatsoever (and without limiting the generality of the foregoing, Tenant hereby specifically waives notice and demand for payment of rent or other obligations and waives any and all other notices or demand requirements imposed by applicable law):

19.1.1   Terminate this Lease and Tenant's right to possession of the Premises and recover from Tenant an award of damages equal to the sum of the following:

19.1.1.1   The Worth at the Time of Award of the unpaid rent which had been earned at the time of termination;

19.1.1.2   The Worth at the Time of Award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rent loss that Tenant affirmatively proves could have been reasonably avoided;

19.1.1.3   The Worth at the Time of Award of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of such rent loss that Tenant affirmatively proves could be reasonably avoided;

19.1.1.4   Any other amount necessary to compensate Landlord for all the detriment either proximately caused by Tenant's failure to perform Tenant's obligations under this Lease or which in the ordinary course of things would be likely to result therefrom; and

19.1.1.5   All such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time under applicable law.

The "Worth at the Time of Award" of the amounts referred to in parts 19.1.1.1 and 19.1.1.2 above, shall be computed by allowing interest at the lesser of a per annum rate equal to: (i) the greatest per annum rate of interest permitted from time to time under applicable law, or (ii) the Prime Rate plus 5%. For purposes hereof, the "Prime Rate" shall be the per annum interest rate publicly announced as its prime or base rate by a federally insured bank selected by Landlord in the State of California. The "Worth at the Time of Award" of the amount referred to in part 19.1.1.3, above, shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus 1%;

19.1.2   Employ the remedy described in California Civil Code § 1951.4 (Landlord may continue this Lease in effect after Tenant's breach and abandonment and recover rent as it becomes due, if Tenant has the right to sublet or assign, subject only to reasonable limitations); or

19.1.3   Notwithstanding Landlord's exercise of the remedy described in California Civil Code § 1951.4 in respect of an Event or Events of Default, at such time thereafter as Landlord may elect in writing, to terminate this Lease and Tenant's right to possession of the Premises and recover an award of damages as provided above in Section 19.1.1.

19.2   The subsequent acceptance of rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the



Initials

-10-

particular rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent. No waiver by Landlord of any breach hereof shall be effective unless such waiver is in writing and signed by Landlord.

19.3    TENANT HEREBY WAIVES ANY AND ALL RIGHTS CONFERRED BY SECTION 3275 OF THE CIVIL CODE OF CALIFORNIA AND BY SECTIONS 1174 (c) AND 1179 OF THE CODE OF CIVIL PROCEDURE OF CALIFORNIA AND ANY AND ALL OTHER REGULATIONS AND RULES OF LAW FROM TIME TO TIME IN EFFECT DURING THE TERM PROVIDING THAT TENANT SHALL HAVE ANY RIGHT TO REDEEM, REINSTATE OR RESTORE THIS LEASE FOLLOWING ITS TERMINATION BY REASON OF TENANT'S BREACH.

19.4    No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given hereunder or now or hereafter existing by agreement, applicable law or in equity. In addition to other remedies provided in this Lease, Landlord shall be entitled, to the extent permitted by applicable law, to injunctive relief, or to a decree compelling performance of any of the covenants, agreements, conditions or provisions of this Lease, or to any other remedy allowed to Landlord at law or in equity. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an Event of Default shall not be deemed or construed to constitute a waiver of such Default.

19.5    This Article 19 shall be enforceable to the maximum extent such enforcement is not prohibited by applicable law, and the unenforceability of any portion thereof shall not thereby render unenforceable any other portion.

19.6    In the event of an uncured Rent payment Default by Tenant under this Lease, Landlord shall have the right to recover as damages any unamortized portion of any inducement or consideration offered to Tenant (including abated Rent for the first twelve months of the Lease Term in the amount of $204,442.00 and Landlord's costs of constructing the Tenant Improvements, amortized on a straight-line basis over the initial Term of the Lease).

19.7    If, on account of any breach or default by Tenant in Tenant's obligations under the terms and conditions of this Lease, it shall become necessary or appropriate for Landlord to employ or consult with an attorney or collection agency concerning or to enforce or defend any of Landlord's rights or remedies arising under this Lease or to collect any sums due from Tenant, Tenant agrees to pay all costs and fees so incurred by Landlord, including, without limitation, reasonable attorneys' fees and costs.

20.    TENANT'S BANKRUPTCY OR INSOLVENCY.

20.1    If at any time and for so long as Tenant shall be subjected to the provisions of the United States Bankruptcy Code or other law of the United States or any state thereof for the protection of debtors as in effect at such time (each a "Debtor's Law"):

20.1.1    Tenant, Tenant as debtor-in-possession, and any trustee or receiver of Tenant's assets (each a "Tenant's Representative") shall have no greater right to assume or assign this Lease or any interest in this Lease, or to sublease any of the Premises than accorded to Tenant in Article 9, except to the extent Landlord shall be required to permit such assumption, assignment or sublease by the provisions of such Debtor's Law. Without limitation of the generality of the foregoing, any right of any Tenant's Representative to assume or assign this Lease or to sublease any of the Premises shall be subject to the conditions that:

20.1.1.1    Such Debtor's Law shall provide to Tenant's Representative a right of assumption of this Lease which Tenant's Representative shall have timely exercised and Tenant's Representative shall have fully cured any default of Tenant under this Lease.

20.1.1.2    Tenant's Representative or the proposed assignee, as the case shall be, shall have deposited with Landlord as security for the timely payment of rent an amount equal to the larger of: (a) three (3) months' rent and other monetary charges accruing under this Lease; and (b) any sum specified in Article 5; and shall have provided Landlord with adequate other assurance of the future performance of the obligations of the Tenant under this Lease. Without limitation, such assurances shall include, at least, in the case of assumption of this Lease, demonstration to the satisfaction of the Landlord that Tenant's Representative has and will continue to have sufficient unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that Tenant's Representative will have sufficient funds to fulfill the obligations of Tenant under this Lease; and, in the case of assignment, submission of current financial statements

-11-

Initials

of the proposed assignee, audited by an independent certified public accountant reasonably acceptable to Landlord and showing a net worth and working capital in amounts determined by Landlord to be sufficient to assure the future performance by such assignee of all of the Tenant's obligations under this Lease.

20.1.1.3 The assumption or any contemplated assignment of this Lease or subleasing any part of the Premises, as shall be the case, will not breach any provision in any other lease, mortgage, financing agreement or other agreement by which Landlord is bound.

20.1.1.4 Landlord shall have, or would have had absent the Debtor's Law, no right under Article 9 to refuse consent to the proposed assignment or sublease by reason of the identity or nature of the proposed assignee or sublessee or the proposed use of the Premises concerned.

21.     **QUIET ENJOYMENT.** Landlord represents and warrants that it has full right and authority to enter into this Lease and that Tenant, while paying the rental and performing its other covenants and agreements contained in this Lease, shall peaceably and quietly have, hold and enjoy the Premises for the Lease Term without hindrance or molestation from Landlord subject to the terms and provisions of this Lease.

22.     **CASUALTY**

22.1     Landlord shall maintain all insurance policies deemed by Landlord to be reasonably necessary or desirable and relating in any manner to the protection, preservation or operation of the Premises, including by not limited to, standard fire and extended coverage insurance covering the Premises in an amount not less than ninety percent (90%) of the replacement cost thereof insuring against the perils of fire and lightning and including extended coverage or, at Landlord's option, all risk coverage and, if Landlord so elects, earthquake, flood and wind coverages and Tenant shall pay, as additional rent, the cost of such policies upon demand by Landlord. Such insurance shall be for the sole benefit of Landlord and under its sole control. Tenant shall not take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained by Landlord hereunder unless Landlord is included as a loss payee thereon. Tenant shall immediately notify Landlord whenever any such separate insurance is taken out and shall promptly deliver to Landlord the policy or policies of such insurance.

22.2     If the Premises or the Building are damaged by fire or other cause and in Landlord's reasonable estimation such damage can be materially restored within one hundred eighty (180) days, Landlord shall forthwith repair the same and this Lease shall remain in full force and effect, except that Tenant shall be entitled to a proportionate abatement in rent from the date of such damage. Such abatement of rent shall be made pro rata in accordance with the extent to which the damage and the making of such repairs shall interfere with the use and occupancy by Tenant of the Premises from time to time. Within forty-five (45) days from the date of such damage, Landlord shall notify Tenant, in writing, of Landlord's reasonable estimation of the length of time within which material restoration can be made, and Landlord's determination shall be binding on Tenant. For purposes of this Lease, the Building or Premises shall be deemed "materially restored" if they are in such condition as would not prevent or materially interfere with Tenant's use of the Premises for the purpose for which it was being used immediately before such damage.

22.3     If such repairs cannot, in Landlord's reasonable estimation, be made within one hundred eighty (180) days, Landlord and Tenant shall each have the option of giving the other, at any time within ninety (90) days after such damage, notice terminating this Lease as of the date of such damage. In the event of the giving of such notice, this Lease shall expire and all interest of the Tenant in the Premises shall terminate as of the date of such damage as if such date had been originally fixed in this Lease for the expiration of the Lease Term. In the event that neither Landlord nor Tenant exercises its option to terminate this Lease, then Landlord shall repair or restore such damage, this Lease continuing in full force and effect, and the rent hereunder shall be proportionately abated as provided in Section 22.2.

22.4     Landlord shall not be required to repair or replace any damage or loss by or from fire or other cause to any panelings, decorations, partitions, additions, railings, ceilings, floor coverings, office fixtures or any other property or improvements installed on the Premises by, or belonging to, Tenant. Any insurance which may be carried by Landlord or Tenant against loss or damage to the Building or Premises shall be for the sole benefit of the party carrying such insurance and under its sole control.

22.5     If Landlord fails to complete such repairs and material restoration within sixty (60) days after the date estimated by Landlord therefor as extended by this Section 22.5, Tenant may at its option and as its sole remedy terminate

-12-

Initials

this Lease by delivering written notice to Landlord, within fifteen (15) days after the expiration of said period of time, whereupon the Lease shall end on the date of such notice or such later date fixed in such notice as if the date of such notice was the date originally fixed in this Lease for the expiration of the Lease Term; provided, however, that if construction is delayed because of changes, deletions or additions in construction requested by Tenant, strikes, lockouts, casualties, Acts of God, war, material or labor shortages, government regulation or control or other causes beyond the reasonable control of Landlord, the period for restoration, repair or rebuilding shall be extended for the amount of time Landlord is so delayed.

22.6     Notwithstanding anything to the contrary contained in this Article:  (a) Landlord shall not have any obligation whatsoever to repair, reconstruct, or restore the Premises when the damages resulting from any casualty covered by the provisions of this Article occur during the last twelve (12) months of the Lease Term or any extension thereof, but if Landlord determines not to repair such damages Landlord shall notify Tenant and if such damages shall render any material portion of the Premises untenantable Tenant shall have the right to terminate this Lease by notice to Landlord within fifteen (15) days after receipt of Landlord's notice; and (b) in the event the holder of any indebtedness secured by a mortgage or deed of trust covering the Premises or Building requires that any insurance proceeds be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within fifteen (15) days after such requirement is made by any such holder, whereupon this Lease shall end on the date of such damage as if the date of such damage were the date originally fixed in this Lease for the expiration of the Lease Term.

22.7     In the event of any damage or destruction to the Building or Premises by any peril covered by the provisions of this Article, it shall be Tenant's responsibility to temporarily secure the Premises and upon notice from Landlord to remove forthwith, at its sole cost and expense, such portion of all of the property belonging to Tenant or its licensees from such portion or all of the Building or Premises as Landlord shall request.

22.8     Tenant hereby waives any and all rights under and benefits of Sections 1932(2) and 1933(4) of the California Civil Code, or any similar or successor Regulations or other laws now or hereinafter in effect.

23.     EMINENT DOMAIN.  If all or any substantial part of the Premises shall be taken or appropriated by any public or quasi-public authority under the power of eminent domain, or conveyance in lieu of such appropriation, either party to this Lease shall have the right, at its option, of giving the other, at any time within thirty (30) days after such taking, notice terminating this Lease, except that Tenant may only terminate this Lease by reason of taking or appropriation, if such taking or appropriation shall be so substantial as to materially interfere with Tenant's use and occupancy of the Premises.  If neither party to this Lease shall so elect to terminate this Lease, the rental thereafter to be paid shall be adjusted on a fair and equitable basis under the circumstances.  In addition to the rights of Landlord above, if any substantial part of the Building shall be taken or appropriated by any public or quasi-public authority under the power of eminent domain or conveyance in lieu thereof, and regardless of whether the Premises or any part thereof are so taken or appropriated, Landlord shall have the right, at its sole option, to terminate this Lease.  Landlord shall be entitled to any and all income, rent, award, or any interest whatsoever in or upon any such sum, which may be paid or made in connection with any such public or quasi-public use or purpose , except that Tenant shall only be entitled to compensation separately awarded to it, if any, for improvements pertaining to the realty owned by Tenant, loss of business goodwill and relocation benefits. Tenant hereby waives any and all rights under and benefits of Section 1265.130 of the California Code of Civil Procedure, or any similar or successor Regulations or other laws now or hereinafter in effect.

24.     SALE BY LANDLORD.  In event of a sale or conveyance by Landlord of the Building, the same shall operate to release Landlord from any future liability upon any of the covenants or conditions, expressed or implied, contained in this Lease in favor of Tenant, and in such event Tenant agrees to look solely to the responsibility of the successor in interest of Landlord in and to this Lease.  Except as set forth in this Article 24, this Lease shall not be affected by any such sale and Tenant agrees to attorn to the purchaser or assignee.  If any security has been given by Tenant to secure the faithful performance of any of the covenants of this Lease, Landlord may transfer or deliver said security, as such, to Landlord's successor in interest and thereupon Landlord shall be discharged from any further liability with regard to said security.

25.     ESTOPPEL CERTIFICATES.  Within ten (10) days following any written request which Landlord may make from time to time, Tenant shall execute and deliver to Landlord or mortgagee or prospective mortgagee a sworn statement certifying: (a) the date of commencement of this Lease; (b) the fact that this Lease is unmodified and in full force and effect (or, if there have been modifications to this Lease, that this lease is in full force and effect, as modified, and stating the date and nature of such modifications); (c) the date to which the rent and other sums payable under this Lease have been paid; (d) the fact that there are no current defaults under this Lease by either Landlord or Tenant except as specified in Tenant's statement; and (e) such other matters as may be reasonably requested by Landlord.  Landlord and Tenant intend that any

-13-

Initials

statement delivered pursuant to this Article 25 may be relied upon by any mortgagee, beneficiary or purchaser, and Tenant shall be liable for all loss, cost or expense resulting from the failure of any sale or funding of any loan caused by any material misstatement known to be untrue by Tenant contained in such estoppel certificate.  Tenant irrevocably agrees that if Tenant fails to execute and deliver such certificate within such ten (10) day period Landlord or Landlord's beneficiary or agent may execute and deliver such certificate on Tenant's behalf, and that such certificate shall be fully binding on Tenant.

26.    SURRENDER OF PREMISES.

    26.1    Tenant shall arrange to meet Landlord for two (2) joint inspections of the Premises, the first to occur at least thirty (30) days (but no more than sixty (60) days) before the last day of the Lease Term, and the second to occur not later than forty-eight (48) hours after Tenant has vacated the Premises.

    26.2    All alterations, additions, and improvements in, on, or to the Premises made or installed by or for Tenant, including, without limitation, carpeting (collectively, "Alterations"), shall be and remain the property of Tenant during the Lease Term.  Upon the expiration or sooner termination of the Lease Term, all Alterations affixed to the real property, excluding racking or similar removable trade fixtures, shall become a part of the realty and shall belong to Landlord without compensation, and title shall pass to Landlord under this Lease as by a bill of sale, except for any Alterations initially constructed or installed in the Premises by Tenant with Landlord's approval.  At the end of the Lease Term or any renewal of the Lease Term or other sooner termination of this Lease, Tenant will peaceably deliver up to Landlord possession of the Premises, together with all Alterations by whomsoever made, in the same conditions received or first installed, broom clean and free of all debris, excepting only ordinary wear and tear and damage by fire or other casualty.  Notwithstanding the foregoing, if Landlord elects by notice given to Tenant at least ten (10) days prior to expiration of the Lease Term, Tenant shall, at Tenant's sole cost, remove any Alterations (excluding carpeting), so designated by Landlord's notice, and repair any damage caused by such removal.  Tenant must, at Tenant's sole cost, remove upon termination of this Lease, any and all of Tenant's furniture, furnishings, equipment, movable partitions of less than full height from floor to ceiling and other trade fixtures and personal property, as well as all data/telecommunications cabling and wiring installed by or on behalf of Tenant, whether inside walls, under any raised floor or above any ceiling (collectively, "Personalty").  Personalty not so removed shall be deemed abandoned by the Tenant and title to the same shall thereupon pass to Landlord under this Lease as by a bill of sale, but Tenant shall remain responsible for the cost of removal and disposal of such Personalty, as well as any damage caused by such removal.  In lieu of requiring Tenant to remove Alterations and Personalty and repair the Premises as aforesaid, Landlord may, by written notice to Tenant delivered at least thirty (30) days before the Termination Date, require Tenant to pay to Landlord, as additional rent hereunder, the cost of such removal and repair in an amount reasonably estimated by Landlord.

    26.3    All obligations of Tenant under this Lease not fully performed as of the expiration or earlier termination of the Lease Term shall survive the expiration or earlier termination of the Lease Term.  Upon the expiration or earlier termination of the Lease Term, Tenant shall pay to Landlord the amount, as estimated by Landlord, necessary to repair and restore the Premises as provided in this Lease and/or to discharge Tenant's obligation for unpaid amounts due or to become due to Landlord.  All such amounts shall be used and held by Landlord for payment of such obligations of Tenant, with Tenant being liable for any additional costs upon demand by Landlord, or with any excess to be returned to Tenant after all such obligations have been determined and satisfied.  Any otherwise unused Security Deposit shall be credited against the amount payable by Tenant under this Lease.

27.    NOTICES.  Any notice or document required or permitted to be delivered under this Lease shall be addressed to the intended recipient, by fully prepaid registered or certified United States Mail return receipt requested, or by reputable independent contract delivery service furnishing a written record of attempted or actual delivery, and shall be deemed to be delivered when tendered for delivery to the addressee at its address set forth on the Reference Pages, or at such other address as it has then last specified by written notice delivered in accordance with this Article 27, or if to Tenant at either its aforesaid address or its last known registered office or home of a general partner or individual owner, whether or not actually accepted or received by the addressee.  Any such notice or document may also be personally delivered if a receipt is signed by and received from, the individual, if any, named in Tenant's Notice Address.

28.    TAXES PAYABLE BY TENANT.  In addition to rent and other charges to be paid by Tenant under this Lease, Tenant shall reimburse to Landlord, upon demand, any and all taxes payable by Landlord (other than net income taxes) whether or not now customary or within the contemplation of the parties to this Lease: (a) upon, allocable to, or measured by or on the gross or net rent payable under this Lease, including without limitation any gross income tax or excise tax levied by the State, any political subdivision thereof, or the Federal Government with respect to the receipt of such rent; (b) upon or

-14-

Initials  ME

with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy of the Premises or any portion thereof, including any sales, use or service tax imposed as a result thereof; or (c) upon or measured by the Tenant's gross receipts or payroll or the value of Tenant's equipment, furniture, fixtures and other personal property of Tenant or leasehold improvements, alterations or additions located in the Premises. In addition to the foregoing, Tenant agrees to pay, before delinquency, any and all taxes levied or assessed against Tenant and which become payable during the term hereof upon Tenant's equipment, furniture, fixtures and other personal property of Tenant located in the Premises.

29.     **DEFINED TERMS AND HEADINGS.** The Article headings shown in this Lease are for convenience of reference and shall in no way define, increase, limit or describe the scope or intent of any provision of this Lease. Any indemnification or insurance of Landlord shall apply to and inure to the benefit of all the following "Landlord Entities", being Landlord, Landlord's investment manager, and the trustees, boards of directors, officers, general partners, beneficiaries, stockholders, employees and agents of each of them. Any option granted to Landlord shall also include or be exercisable by Landlord's trustee, beneficiary, agents and employees, as the case may be. In any case where this Lease is signed by more than one person, the obligations under this Lease shall be joint and several. The terms "Tenant" and "Landlord" or any pronoun used in place thereof shall indicate and include the masculine or feminine, the singular or plural number, individuals, firms or corporations, and each of their respective successors, executors, administrators and permitted assigns, according to the context hereof. The term "rentable area" shall mean the rentable area of the Building as calculated by the Landlord on the basis of the plans and specifications of the Building including a proportionate share of any common areas. Tenant hereby accepts and agrees to be bound by the figures for the rentable square footage of the Building and Tenant's Proportionate Share shown on the Reference Pages; however, Landlord may adjust either or both figures if there is manifest error, addition or subtraction to the Building or any business park or complex of which the Building is a part, remeasurement or other circumstance reasonably justifying adjustment.

30.     **TENANT'S AUTHORITY.** If Tenant signs as a corporation, partnership, trust or other legal entity each of the persons executing this Lease on behalf of Tenant represents and warrants that Tenant has been and is qualified to do business in the state in which the Building is located, that the entity has full right and authority to enter into this Lease, and that all persons signing on behalf of the entity were authorized to do so by appropriate actions. Tenant agrees to deliver to Landlord, simultaneously with the delivery of this Lease, a corporate resolution, proof of due authorization by partners, opinion of counsel or other appropriate documentation reasonably acceptable to Landlord evidencing the due authorization of Tenant to enter into this Lease. Tenant hereby represents and warrants that neither Tenant, nor any persons or entities holding any legal or beneficial interest whatsoever in Tenant, are (i) the target of any sanctions program that is established by Executive Order of the President or published by the Office of Foreign Assets Control, U.S. Department of the Treasury ("OFAC"); (ii) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the Patriot Act, Public Law 107-56, Executive Order 13224 (September 23, 2001) or any Executive Order of the President issued pursuant to such statutes; or (iii) named on the following list that is published by OFAC: "List of Specially Designated Nationals and Blocked Persons." If the foregoing representation is untrue at any time during the Lease Term, an Event of Default will be deemed to have occurred, without the necessity of notice to Tenant.

31.     **FINANCIAL STATEMENTS AND CREDIT REPORTS.** At Landlord's request, Tenant shall deliver to Landlord a copy, certified by an officer of Tenant as being a true and correct copy, of Tenant's most recent audited financial statement, or, if unaudited, certified by Tenant's chief financial officer as being true, complete and correct in all material respects. Tenant hereby authorizes Landlord to obtain one or more credit reports on Tenant at any time, and shall execute such further authorizations as Landlord may reasonably require to obtain a credit report.

32.     **COMMISSIONS.** Each of the parties represents and warrants to the other that it has not dealt with any broker or finder in connection with this Lease, except as described on the Reference Pages.

33.     **TIME AND APPLICABLE LAW.** Time is of the essence of this Lease and all of its provisions. This Lease shall in all respects be governed by the laws of the state in which the Building is located and venue shall be located in the county in which the Building is located.

34.     **SUCCESSORS AND ASSIGNS.** Subject to the provisions of Article 9, the terms, covenants and conditions contained in this Lease shall be binding upon and inure to the benefit of the heirs, successors, executors, administrators and assigns of the parties to this Lease.



Initials

-15-

35.     **ENTIRE AGREEMENT.**  This Lease, together with its exhibits, contains all agreements of the parties to this Lease and supersedes any previous negotiations.  There have been no representations made by the Landlord or any of its representatives or understandings made between the parties other than those set forth in this Lease and its exhibits.  This Lease may not be modified except by a written instrument duly executed by the parties to this Lease.

36.     **EXAMINATION NOT OPTION.**  Submission of this Lease shall not be deemed to be a reservation of the Premises.  Landlord shall not be bound by this Lease until it has received a copy of this Lease duly executed by Tenant and has delivered to Tenant a copy of this Lease duly executed by Landlord, and until such delivery Landlord reserves the right to exhibit and lease the Premises to other prospective tenants.

37.     **RECORDATION.**  Tenant shall not record or register this Lease or a short form memorandum hereof without the prior written consent of Landlord, and then shall pay all charges and taxes incident such recording or registration.

38.     **LIMITATION OF LANDLORD'S LIABILITY.**  Redress for any claim against Landlord under this Lease shall be limited to and enforceable only against and to the extent of Landlord's interest in the Project.  The obligations of

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*



Initials

Landlord under this Lease are not intended to be and shall not be personally binding on, nor shall any resort be had to the private properties of, any of its or its investment manager's trustees, directors, officers, partners, beneficiaries, members, stockholders, employees, or agents, and in no case shall Landlord be liable to Tenant hereunder for any lost profits, damage to business, or any form of special, indirect or consequential damages.

**LANDLORD:**                                      **TENANT:**

**MOUNTAIN VIEW INDUSTRIAL CENTER, LLC,**          **STATER BROS. MARKETS,**
a Delaware limited liability company               a California corporation

By:   CalSMART L.L.C., a Delaware limited
      liability company, acting with respect to its
      Series C of limited liability company interests
      Its Manager                                  By: _____

      By:   RREEF America L.L.C.,                      Jack H. Brown
            a Delaware limited liability company       Chairman of the Board
            Its Manager                                and Chief Executive Officer

      By: _____
          Ashley Powell    Mark English        By: _____
          Managing Director  Vice President         Mike Slaton
                                                     Senior Director of Real Estate

Dated: _Feb. 12, 2009_                             Dated: _____

-17-



SW GROUND FLOOR PLAN     BUILDING 3

A

## EXHIBIT A
## (CONT'D)

## PREMISES SITE PLAN



**EXHIBIT B**

**TENANT IMPROVEMENTS**

The following terms and conditions are attached as **Exhibit B** to, and forms part of, that certain  Gross Lease (Modified) dated January 7, 2009 ("Lease"), between **MOUNTAIN VIEW INDUSTRIAL CENTER, LLC**, a Delaware limited liability company ("Landlord") and **STATER BROS. MARKETS**, a California corporation ("Tenant").

1.1  **Tenant Improvements.**  Landlord will deliver the Premises in "turn-key" condition with the following improvements completed: (i) four (4) battery charging stations; (ii) a gated and fenced truck court; (iii) T-5 warehouse lighting; (iv) fifteen (15) edge of dock levelers; and (v) a demising wall separating the Premises from the remainder of the space in the Building ("Tenant Improvements"), as shown and described on the preliminary space plan attached as _Exhibit A_ to the Lease ("Preliminary Space Plan").

1.2  **Costs.**  Landlord will pay for the cost of constructing the Tenant Improvements based on a mutually agreed upon space plan and cost proposal based on Project-standard improvements and finishes (e.g., tenant improvements and finishes in the existing Buildings 1 and 2 in the Project), provided that such cost shall not exceed $131,000.00 ("Allowance"). Tenant may request any change orders before Landlord completes the Tenant Improvements, provided that Tenant will be responsible for all additional costs in excess of the Allowance and any delays resulting therefrom.  Landlord will advise Tenant of the costs and delays associated with a change order (on an open book basis with subcontractor back-up showing line item breakdown of unit price and/or time and materials) so that Tenant can determine whether to proceed with the change order.  Landlord may implement such change orders in Landlord's reasonable discretion due to conditions discovered or issues identified during the course of construction or to comply with applicable Laws.  Landlord will advise Tenant of any such changes.

1.3  **Selection of Architect and Engineers.**  Landlord is responsible for selecting and hiring (i) a qualified licensed architect to prepare the plans and drawings for the Tenant Improvements (the "Architect"), and (ii) the necessary engineering consultants and subcontractors (the "Engineers") to prepare all plans, specifications and engineering working drawings relating to the structural, mechanical, electrical, plumbing, HVAC, fire-life-safety, and sprinkler work for the Tenant Improvements (subject to Landlord's reasonable prior approval).  Landlord will not be liable or responsible for any deficiencies, omissions or errors in the plans and drawings prepared by Architect.

1.4  **Selection of Contractor.**  Landlord is responsible for selecting and hiring a general contractor to construct the Tenant Improvements (the "Contractor").

1.5  **Tenant's Representative.**  Tenant designates Mike Slaton, as its sole representative with respect to any matters relating to the construction of the Tenant Improvements, who will have full authority and responsibility to act on behalf of the Tenant as required hereunder, unless and until Tenant designates a different person to serve as Tenant's representative in writing to Landlord.

1.6  **Landlord's Representative.**  Landlord designates Kelly Stassel, Vice President, PGP Partners, Inc., as its sole representative with respect to any matters relating to the construction of the Tenant Improvements, who will have full authority and responsibility to act on behalf of the Landlord as required hereunder, unless and until Landlord designates a different person to serve as Landlord's representative in writing to Tenant.

1.7  **Space Plan.**  Landlord will direct the Architect to prepare the final space plan for the Tenant Improvements in the Premises (collectively, the "Final Space Plan"), which Final Space Plan shall include a layout and designation of all offices, rooms (including all mechanical and electrical rooms) and other partitioning, their intended use, and equipment to be contained therein, as well as any special or excess floor loading requirements.  Landlord and Tenant will, within 2 business days after Architect's delivery of the Final Space Plan, either (i) approve the Final Space Plan, (ii) approve the Final Space Plan subject to specified conditions to be complied with when the Final Working Drawings are prepared and submitted for approval, or (iii) disapprove the Final Space Plan and return the same to Architect with requested revisions.  The foregoing process shall be repeated until Landlord and Tenant mutually approve the Final Space Plan.

1.8  **Final Working Drawings.**  Based upon and in compliance with the Final Space Plan, Landlord will direct the Architect and the Engineers to complete the architectural and engineering drawings for the Premises, and the final architectural working drawings in a form sufficient to allow subcontractors to bid on the Tenant Improvements work and to obtain all applicable permits for the construction of the Tenant Improvements (collectively, the "Final Working

B-1

Initials

Drawings"). The Architect and Engineers may submit the Final Working Drawings in one or more stages for approval by Landlord and Tenant. Within 5 business days after Architect and Engineers deliver the Final Working Drawings, Landlord and Tenant, respectively, will either (i) approve the Final Working Drawings, (ii) approve the Final Working Drawings subject to specified conditions to be satisfied prior to submitting the Approved Working Drawings for Permits as set forth below, or (iii) disapprove the Final Working Drawings and return the same to Architect and Engineers with requested revisions. Landlord will direct the Architect and/or Engineers to revise the Final Working Drawings to address any conditions or objections of Landlord or Tenant, and resubmit the revised Final Working Drawings within 5 business days thereafter for approval by Landlord and Tenant. Landlord and Tenant shall approve or disapprove of the resubmitted Final Working Drawings within 5 business days after receiving such resubmitted Final Working Drawings. The foregoing process shall be repeated until Landlord and Tenant mutually approve the Final Working Drawings. The Final Working Drawings as finally approved by Landlord and Tenant pursuant to this Section are referred to herein as the "Approved Working Drawings." All plans and drawings prepared by the Architect and the Engineers for the Tenant Improvements, including the Final Space Plan, the Final Working Drawings and the Approved Working Drawings, are referred to herein collectively as the "Construction Drawings."

1.9   Approved Working Drawings; Permits. Landlord will submit the Approved Working Drawings to the appropriate municipal authorities for all applicable building permits necessary to allow Contractor to commence and complete the construction of the Tenant Improvements (the "Permits"), and will make any modifications or revisions to the Approved Working Drawings as may be required by the municipal authorities as conditions to the issuance of the Permits. No changes, modifications or alterations in the Final Space Plan or the Approved Working Drawings may be made without the prior written consent of both Landlord and Tenant, which consent shall not be unreasonably withheld or delayed.

1.10   Cost Proposal. Within 20 business days after the Approved Working Drawings are approved by Landlord and Tenant, Landlord will obtain a cost proposal from the Contractor for the construction of the Tenant Improvements based on the Approved Working Drawings and open book bids obtained from approved subcontractors (the "Cost Proposal"). Landlord and Tenant will cooperate to mutually approve the Cost Proposal (including subcontractor contracts) or specify in writing any objections that either party may have to the Cost Proposal within 10 business days of the parties' receipt of the Cost Proposal. If either party specifies objections to the Cost Proposal, the parties will cooperate to revise the Cost Proposal to address such objections within 20 business days of the parties' receipt of the Cost Proposal.

1.11   Good Faith Cooperation. Promptly after the execution of the Lease, both Landlord and Tenant will diligently and in good faith cooperate with each other, the Architect, the Engineers and the Contractor to approve and complete all phases of the Construction Drawings, the Cost Proposal and the Permits. Landlord, Contractor and Tenant will meet on a weekly basis to discuss the progress of construction of the Tenant Improvements. Tenant will facilitate any necessary coordination between Landlord/Contractor and Tenant's vendors/contractors.

1.12   Notice of Completion. Within 10 business days after completion of construction of the Tenant Improvements, Landlord will cause a statutory Notice of Completion to be recorded in the office of the County Recorder for the county in which the Premises are located in accordance with Section 3093 of the Civil Code of the State of California or any successor statute, and shall furnish a copy thereof to Tenant upon such recordation.

1.13   Warranties. Landlord hereby assigns to Tenant any and all express written warranties provided by contractors, subcontractors, suppliers or manufacturers with respect to the Tenant Improvements.

1.14   Delivery Condition. On or before the Commencement Date, Landlord shall deliver the Premises in broom-clean condition, clear of debris and with all mechanical, electrical, plumbing and entryway and loading doors in good working order, and with the office improvements completed. Tenant acknowledges that the following Tenant Improvements will not be completed before the Commencement Date: demising walls, warehouse lights, truck yard fence and battery charging stations.

B-1



Initials

**EXHIBIT C**

**COMMENCEMENT DATE MEMORANDUM**

THIS MEMORANDUM, made as of _____, 20___, by and between MOUNTAIN VIEW INDUSTRIAL CENTER, LLC, a Delaware limited liability company ("Landlord") and STATER BROS. MARKETS, a California corporation ("Tenant").

<u>Recitals:</u>

A.   Landlord and Tenant are parties to that certain Lease, dated for reference _____, 20__ (the "Lease") for certain premises (the "Premises") consisting of approximately ___ square feet at the building commonly known as _____.

B.   Tenant is in possession of the Premises and the Lease Term has commenced.

C.   Landlord and Tenant desire to enter into this Memorandum confirming the Commencement Date, the Termination Date and other matters under the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.   The actual Commencement Date is _____.

2.   The actual Termination Date is _____.

3.   The schedule of the Annual Rent and the Monthly Installment of Rent set forth on the Reference Pages is deleted in its entirety, and the following is substituted therefor:

*[Insert rent schedule]*

4.   Capitalized terms not defined herein shall have the same meaning as set forth in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date and year first above written.

**LANDLORD:**                                    **TENANT:**

**MOUNTAIN VIEW INDUSTRIAL CENTER, LLC,**        **STATER BROS. MARKETS,**
a Delaware limited liability company             a California corporation

By:   CalSMART L.L.C., a Delaware limited
      liability company, acting with respect to its
      Series C of limited liability company interests   By:   <u>DO NOT SIGN</u>
      Its Manager
                                                 Name: _____
      By:   RREEF America L.L.C.,
            a Delaware limited liability company   Title: _____
            Its Manager

            By:   <u>DO NOT SIGN</u>            By:   <u>DO NOT SIGN</u>
                  Ashley Powell, Director
                                                 Name: _____

                                                 Title: _____

Initials

**EXHIBIT D**

**RULES AND REGULATIONS**

1.      No sign, placard, picture, advertisement, name or notice (collectively referred to as "Signs") shall be installed or displayed on any part of the outside of the Building without the prior written consent of the Landlord which consent shall be in Landlord's sole discretion. All approved Signs shall be printed, painted, affixed or inscribed at Tenant's expense by a person or vendor approved by Landlord and shall be removed by Tenant at Tenant's expense upon vacating the Premises. Landlord shall have the right to remove any Sign installed or displayed in violation of this rule at Tenant's expense and without notice.

2.      If Landlord objects in writing to any curtains, blinds, shades or screens attached to or hung in or used in connection with any window or door of the Premises or Building, Tenant shall immediately discontinue such use. No awning shall be permitted on any part of the Premises. Tenant shall not place anything or allow anything to be placed against or near any glass partitions or doors or windows which may appear unsightly, in the opinion of Landlord, from outside the Premises.

3.      Tenant, upon the termination of its tenancy, shall deliver to Landlord the keys or other means of access to all doors.

4.      If Tenant requires telephone, data, burglar alarm or similar service, the cost of purchasing, installing and maintaining such service shall be borne solely by Tenant. No boring or cutting for wires will be allowed without the prior written consent of Landlord. Landlord shall direct electricians as to where and how telephone, data, and electrical wires are to be introduced or installed. The location of burglar alarms, telephones, call boxes or other office equipment affixed to the Premises shall be subject to the prior written approval of Landlord.

5.      Tenant shall not place a load upon any floor of its Premises, including mezzanine area, if any, which exceeds the load per square foot that such floor was designed to carry and that is allowed by law. Heavy objects shall stand on such platforms as determined by Landlord to be necessary to properly distribute the weight. Landlord will not be responsible for loss of or damage to any such equipment or other property from any cause, and all damage done to the Building by maintaining or moving such equipment or other property shall be repaired at the expense of Tenant.

6.      Tenant shall not install any radio or television antenna, satellite dish, loudspeaker or other device on the roof or exterior walls of the Building without Landlord's prior written consent which consent shall be in Landlord's sole discretion.

7.      Tenant shall not mark, drive nails, screw or drill into the partitions, woodwork, plaster or drywall (except for pictures and general office uses) or in any way deface the Premises or any part thereof.   Tenant shall not affix any floor covering to the floor of the Premises or paint or seal any floors in any manner except as approved by Landlord. Tenant shall repair any damage resulting from noncompliance with this rule.

8.      No cooking shall be done or permitted on the Premises, except that Underwriters' Laboratory approved microwave ovens or equipment for brewing coffee, tea, hot chocolate and similar beverages shall be permitted, provided that such equipment and use is in accordance with all applicable federal, state and city laws, codes, ordinances, rules and regulations.

9.      Tenant shall not use any hand trucks except those equipped with the rubber tires and side guards, and may use such other material-handling equipment as Landlord may approve. Tenant shall not bring any other vehicles of any kind into the Building. Forklifts which operate on asphalt areas shall only use tires that do not damage the asphalt.

10.      Tenant shall not use the name of the Building or any photograph or other likeness of the Building in connection with or in promoting or advertising Tenant's business except that Tenant may include the Building name in Tenant's address. Landlord shall have the right, exercisable without notice and without liability to any tenant, to change the name and address of the Building.

11.      All trash and refuse shall be contained in suitable receptacles at locations approved by Landlord. Tenant shall not place in the trash receptacles any personal trash or material that cannot be disposed of in the ordinary and customary manner of removing such trash without violation of any law or ordinance governing such disposal.

12.      Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governing authority.

13.     Tenant assumes all responsibility for securing and protecting its Premises and its contents including keeping doors locked and other means of entry to the Premises closed.

14.     Tenant shall not use any method of heating or air conditioning other than that supplied by Landlord without Landlord's prior written consent.

15.     No person shall go on the roof without Landlord's permission.

16.     Tenant shall not permit any animals, other than certified service animals, to be brought or kept in or about the Premises or any common area of the property.

17.     Tenant shall not permit any motor vehicles to be washed or mechanical work or maintenance of motor vehicles to be performed on any portion of the Premises or parking lot.

18.     These Rules and Regulations are in addition to, and shall not be construed to in any way modify or amend, in whole or in part, the terms, covenants, agreements and conditions of any lease of any premises in the Building.  Landlord may waive any one or more of these Rules and Regulations for the benefit of any tenant or tenants, and any such waiver by Landlord shall not be construed as a waiver of such Rules and Regulations for any or all tenants.

19.     Landlord reserves the right to make such other and reasonable rules and regulations as in its judgment may from time to time be needed for safety and security, for care and cleanliness of the Building and for the preservation of good order in and about the Building.  Tenant agrees to abide by all such rules and regulations herein stated and any additional rules and regulations which are adopted.  Tenant shall be responsible for the observance of all of the foregoing rules by Tenant's employees, agents, clients, customers, invitees and guests.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

Initials

01/07/2009 (v5)

800-422-9191
www.prosupplies.net

TREEHUGGER™
30% PCW RECYCLED TAB
A Pro Office and Filing Supplies Product

**EXHIBIT B**



## STANDARD SUBLEASE

(Long-form to be used with pre-1996 AIR leases)
(NOTE: NOT DESIGNED FOR SITUATIONS WHERE LESS THAN ENTIRE PREMISES ARE BEING SUBLET)

1. **Basic Provisions ("Basic Provisions").**

    1.1 Parties: This Sublease ("Sublease"), dated for reference purposes only <u>February 6, 2018</u> .
    Is made by and between <u>Stater Bros. Markets, a California corporation</u>

    _____ ("Sublessor") and

    <u>Carolina Transportation, Inc.</u>

    _____ ("Sublessee").

    (collectively the "Parties", or individually a "Party").

    1.2 Premises: That certain real property, including all improvements therein, and commonly known by the street
    address of <u>1450 Mountain View Avenue, Redlands</u>
    located in the County of <u>San Bernardino</u>, State of <u>California</u>
    and generally described as (describe briefly the nature of the property) <u>an approximate 65,520 square foot</u>
    <u>warehouse/distribution space</u> ("Premises").

    1.3 Term: <u>N/A</u> years and <u>eleven and one-half</u> months
    commencing <u>February 15, 2018</u> ("Commencement Date") and
    ending <u>January 31, 2019</u> ("Expiration Date").

    1.4 Early Possession: If the Premises are available Sublessee may have non-exclusive possession of the Premises
    commencing <u>Upon fully executed sublease</u> ("Early Possession Date").

    1.5 Base Rent: $ 32,104.80 per month ("Base Rent"),
    payable on the ~~fifteenth (15th)~~ <u>first (1st)</u> day of each month commencing
    ~~February 2018~~ <u>March 2018</u> .

    ☐ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted.

    1.6 Base Rent and Other Monies Paid Upon Execution:

    (a) Base Rent: $ 32,104.80 _____ for the period

    _____

    (b) Security Deposit: $32,104.80 ("Security Deposit").
    (c) Association Fees: $ _____ for the period

    _____

    (d) Other: $ _____ for _____

    _____

    (e) Total Due Upon Execution of this Lease: $64,209.60

    1.7 Agreed Use: The Premises shall be used and occupied only for <u>Warehousing and distribution,</u>

    _____ and for no other purposes.

    1.8 Real Estate Brokers:
    (a) Representation: The following real estate brokers ( the "Brokers") and brokerage relationships exist in
    this transaction (check applicable boxes):
    ☑ <u>Lee & Associates®-Ontario</u> represents Sublessor exclusively ("Sublessor's Broker");
    ☑ <u>Jones Lang LaSalle</u> represents Sublessee exclusively ("Sublessee's Broker"); or
    ☐ _____ represents both Sublessor and Sublessee ("Dual Agency").
    (b) Payment to Brokers: Upon execution and delivery of this Sublease by both Parties, Sublessor shall pay to the
    Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of _____ or
    ___ % of the total Base Rent) for the brokerage services rendered by the Brokers.

    ~~1.9 Guarantor. The obligations of the Sublessee under this Sublease shall be guaranteed by~~ _____

    _____

    _____

    ("Guarantor").

    1.10 Attachments. Attached hereto are the following, all of which constitute a part of this Sublease:
    ☐ an Addendum consisting of Paragraphs _____ through _____;
    ☑ a plot plan depicting the Premises (Exhibit "A");
    ☐ a Work Letter;
    ☑ a copy of the master lease and any and all amendments to such lease (collectively the "Master Lease");
    ☑ other (specify): <u>Uniform Disclaimer Sublease Form, Disclosure Regarding Real Estate Agency</u>

PAGE 1 OF 7

INITIALS                                                                                      INITIALS

©1997 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM SBL-8-12/16E

**2.   Premises.**

**2.1   Letting.** Sublessor hereby subleases to Sublessee, and Sublessee hereby subleases from Sublessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Sublease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. Note: Sublessee is advised to verify the actual size prior to executing this Sublease.    in "As Is" Condition

**2.2   Condition.** Sublessor shall deliver the Premises to Sublessee ~~broom clean, and free of debris on the~~ Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), and any items which the Sublessor is obligated to construct pursuant to the Work Letter attached hereto, if any, other than those ~~constructed~~ by Sublessee, shall be in good operating condition on said date. If a non-compliance with such warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate ~~warranty~~ period, Sublessor shall, as Sublessor's sole obligation with respect to such matter, except as otherwise provided in this Sublease, promptly after receipt of written notice from Sublessee setting forth with specificity the nature and extent of such ~~non-~~compliance, malfunction or failure, rectify same at Sublessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements. If Sublessee does not give Sublessor the required notice within the appropriate warranty period, correction of any such non-compliance, ~~malfunction or failure shall be the obligation of Sublessee at Sublessee's sole cost and expense~~

~~2.3   Compliance. Sublessor warrants that any improvements, alterations or utility installations made or installed by or on behalf of Sublessor to or on the Premises comply with all applicable covenants or restrictions of record and applicable building codes, regulations and ordinances ("Applicable Requirements") in effect on the date that they were made or installed.~~ Sublessor makes no warranty as to the use to which Sublessee will put the Premises or to modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Sublessee's use. NOTE: Sublessee is responsible for determining whether or not the zoning and other Applicable Requirements are appropriate for Sublessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Sublessor shall, except as otherwise provided, promptly after receipt of written notice from Sublessee setting forth with specificity the nature and extent of such non-compliance, rectify the same. If the Applicable Requirements are hereafter changed so as to require during the term of this Sublease the construction of an addition to or an alteration of the Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Building ("Capital Expenditure"), Sublessor and Sublessee shall allocate the cost ~~of such work as follows:~~

~~(a)   If such Capital Expenditures are required as a result of the specific and unique use of the Premises by Sublessee~~ as compared with uses by tenants in general, Sublessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last two years of this Sublease and the cost thereof exceeds 6 months' Base Rent, Sublessee may instead terminate this Sublease unless Sublessor notifies Sublessee in writing, within 10 days after receipt of Sublessee's termination notice that Sublessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent. If the Parties elect termination, Sublessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Sublessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier then the last day that Sublessee could legally utilize the Premises without ~~commencing such Capital Expenditure.~~

~~(b)   If such Capital Expenditure is not the result of the specific and unique use of the Premises by Sublessee~~ (such as governmentally mandated seismic modifications), then Sublessor shall pay for said Capital Expenditure and the cost thereof shall be prorated between the Sublessor and Sublessee and Sublessee shall only be obligated to pay, each month during the remainder of the term of this Sublease or any extension therof, on the date on which Rent is due, an amount equal to 1/144th the cost of such Capital Expenditure. Sublessee shall pay interest on the unamortized balance at a rate that is then commercially reasonable in the judgment of Sublessor's accountant. Sublessee may, however, prepay its obligation at any time. Provided, however, that if such Capital Expenditure is required during the last 2 years of this Sublease or if Sublessor reasonably determines that it is not economically feasible to pay its share thereof, Sublessor shall have the option to terminate this Sublease upon 90 days prior written notice to Sublessee unless Sublessee notifies Sublessor, in writing, within 10 days after receipt of Sublessor's termination notice that Sublessee will pay for such Capital Expenditure. If Sublessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Sublessee may advance such funds and deduct same, with interest, from Rent until Sublessor's share of such costs have been fully paid. If Sublessee is unable to finance Sublessor's share, or if the balance of the Rent due and payable for the remainder of this Sublease is not sufficient to fully reimburse Sublessee on an offset basis, Sublessee shall have the right to terminate ~~this Sublease upon 10 days written notice to Sublessor.~~

~~(c)   Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to~~ non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Sublessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, ~~Sublessee shall be fully responsible for the cost thereof, and Sublessee shall not have any right to terminate this Sublease~~

**2.4   Acknowledgements.** Sublessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Sublessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Sublessee's intended use, (c) Sublessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as they same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises

INITIALS                                                           PR
                                                                 INITIALS

©1997 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM SBL-8-12/16E

made by Brokers or Sublessor, (e) the square footage of the Premises was not material to Sublessee's decision to sublease the Premises and pay the Rent stated herein, and (f) neither Sublessor, Sublessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Sublease. In addition, Sublessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Sublessee's ability to honor the Sublease or suitability to occupy the Premises, and (ii) it is Sublessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.6    Americans with Disabilities Act.  In the event that as a result of Sublessee's use, or intended use, of the Premises the Americans with Disabilities Act or any similar law requires modifications or the construction or installation of improvements in or to the Premises, Building, Project and/or Common Areas, the Parties agree that such modifications, construction or improvements shall be made at: ☐ Sublessor's expense  ☒ Sublessee's expense.

3.    Possession.

3.1    Early Possession.  Any provision herein granting Sublessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date.  Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises.  If Sublessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession.  All other terms of this Sublease (including but not limited to the obligations to pay Sublessee's Share of Common Area Operating Expenses, Real Property Taxes and insurance premiums and to maintain the Premises) shall, however, be in effect during such period.  Any such Early Possession shall not affect the Expiration Date.

3.2    Delay in Commencement.  Sublessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises by the Commencement Date.  If, despite said efforts, Sublessor is unable to deliver possession as agreed, Sublessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Sublease.  Sublessee shall not, however, be obligated to pay Rent or perform its other obligations until it receives possession of the Premises.  If possession is not delivered within 60 days after the Commencement Date, Sublessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Sublease, in which event the Parties shall be discharged from all obligations hereunder.  If such written notice is not received by Sublessor within said 10 day period, Sublessee's right to cancel shall terminate.  Except as otherwise provided, if possession is not tendered to Sublessee when required and Sublessee does not terminate this Sublease, as aforesaid, any period of rent abatement that Sublessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Sublessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Sublessee.  If possession is not delivered within 120 days after the Commencement Date, this Sublease shall automatically terminate unless the Parties agree, in writing, to the contrary.

3.3    Sublessee Compliance.  Sublessor shall not be required to tender possession of the Premises to Sublessee until Sublessee complies with its obligation to provide evidence of insurance.  Pending delivery of such evidence, Sublessee shall be required to perform all of its obligations under this Sublease from and after the Start Date, including the payment of Rent, notwithstanding Sublessor's election to withhold possession pending receipt of such evidence of insurance.  Further, if Sublessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Sublessor may elect to withhold possession until such conditions are satisfied.

4.    Rent and Other Charges.

4.1    Rent Defined.  All monetary obligations of Sublessee to Sublessor under the terms of this Sublease (except for the Security Deposit) are deemed to be rent ("Rent").  Rent shall be payable in lawful money of the United States to Sublessor at the address stated herein or to such other persons or at such other places as Sublessor may designate in writing.

4.2    Utilities.  Sublessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon.

5.    Security Deposit.  Sublessee shall deposit with Sublessor the sum specified in Paragraph 1.6(b) as security for Sublessee's faithful performance of Sublessee's obligations hereunder.  If Sublessee fails to pay Rent or other charges due hereunder, or otherwise defaults with respect to any provision of this Sublease, Sublessor may use, apply or retain all or any portion of said deposit for the payment of any Rent or other charge in default or for the payment of any other sum to which Sublessor may become obligated by reason of Sublessee's default, or to compensate Sublessor for any loss or damage which Sublessor may suffer thereby.  If Sublessor so uses or applies all or any, portion of said deposit, Sublessee shall within 10 days after written demand therefore forward to Sublessor an amount sufficient to restore said Deposit to the full amount provided for herein and Sublessee's failure to do so shall be a material breach of this Sublease.  Sublessor shall not be required to keep said Deposit separate from its general accounts.  If Sublessee performs all of Sublessee's obligations hereunder, said Deposit, or so much thereof as has not therefore been applied by Sublessor, shall be returned, without payment of interest to Sublessee (or at Sublessor's option, to the last assignee, if any, of Sublessee's interest hereunder) at the expiration of the term hereof, and after Sublessee has vacated the Premises.  No trust relationship is created herein between Sublessor and Sublessee with respect to said Security Deposit.

6.    Master Lease.

6.1    Sublessor is the lessee of the Premises by virtue of the Master Lease , wherein Mountain View Industrial Center, LLC, a Delaware limited liability company predecessor in interest to IIT Redlands I, LP, a Delaware limited partnership is the lessor, hereinafter the "Master Lessor".

6.2    This Sublease is and shall be at all times subject and subordinate to the Master Lease.

6.3    The terms, conditions and respective obligations of Sublessor and Sublessee to each other under this Sublease

INITIALS                    INITIALS

©1997 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM SBL-6-12/16E

shall be the terms and conditions of the Master Lease except for those provisions of the Master Lease which are directly contradicted by this Sublease in which event the terms of this Sublease document shall control over the Master Lease. Therefore, for the purposes of this Sublease, wherever in the Master Lease the word "Lessor" is used it shall be deemed to mean the Sublessor herein and wherever in the Master Lease the word "Lessee" is used it shall be deemed to mean the Sublessee herein.

6.4     During the term of this Sublease and for all periods subsequent for obligations which have arisen prior to the termination of this Sublease, Sublessee does hereby expressly assume and agree to perform and comply with, for the benefit of Sublessor and Master Lessor, each and every obligation of Sublessor under the Master Lease except for the following paragraphs which are excluded therefrom: _____

_____

6.5     The obligations that Sublessee has assumed under paragraph 6.4 hereof are hereinafter referred to as the "Sublessee's Assumed Obligations". The obligations that sublessee has not assumed under paragraph 6.4 hereof are hereinafter referred to as the "Sublessor's Remaining Obligations".

6.6     Sublessee shall hold Sublessor free and harmless from all liability, judgments, costs, damages, claims or demands, including reasonable attorneys fees, arising out of Sublessee's failure to comply with or perform Sublessee's Assumed Obligations.

6.7     Sublessor agrees to maintain the Master Lease during the entire term of this Sublease, subject, however, to any earlier termination of the Master Lease without the fault of the Sublessor, and to comply with or perform Sublessor's Remaining Obligations and to hold Sublessee free and harmless from all liability, judgments, costs, damages, claims or demands arising out of Sublessor's failure to comply with or perform Sublessor's Remaining Obligations.

6.8     Sublessor represents to Sublessee that the Master Lease is in full force and effect and that no default exists on the part of any Party to the Master Lease.

7.     Assignment of Sublease and Default.

7.1     Sublessor hereby assigns and transfers to Master Lessor Sublessor's interest in this Sublease, subject however to the provisions of Paragraph 8.2 hereof.

7.2     Master Lessor, by executing this document, agrees that until a Default shall occur in the performance of Sublessor's Obligations under the Master Lease, that Sublessor may receive, collect and enjoy the Rent accruing under this Sublease. However, if Sublessor shall Default in the performance of its obligations to Master Lessor then Master Lessor may, at its option, receive and collect directly from Sublessee, all Rent owing and to be owed under this Sublease. In the event, however, that the amount collected by Master Lessor exceeds Sublessor's obligations any such excess shall be refunded to Sublessor. Master Lessor shall not, by reason of this assignment of the Sublease nor by reason of the collection of the Rent from the Sublessee, be deemed liable to Sublessee for any failure of the Sublessor to perform and comply with Sublessor's Remaining Obligations.

7.3     Sublessor hereby irrevocably authorizes and directs Sublessee upon receipt of any written notice from the Master Lessor stating that a Default exists in the performance of Sublessor's obligations under the Master Lease, to pay to Master Lessor the Rent due and to become due under the Sublease. Sublessee agrees that Sublessee shall have the right to rely upon any such statement and request from Master Lessor, and that Sublessee shall pay such Rent to Master Lessor without any obligation or right to inquire as to whether such Default exists and notwithstanding any notice from or claim from Sublessor to the contrary and Sublessee shall have no right or claim against Sublessee for any such Rent so paid to Sublessee.

7.4     No changes or modifications shall be made to this Sublease without the consent of Master Lessor.

8.     Consent of Master Lessor.

8.1     In the event that the Master Lease requires that Sublessor obtain the consent of Master Lessor to any subletting by Sublessor then, this Sublease shall not be effective unless, within 10 days of the date hereof, Master Lessor signs this Sublease thereby giving its consent to this Subletting.

8.2     In the event that the obligations of the Sublessor under the Master Lease have been guaranteed by third parties, then neither this Sublease, nor the Master Lessor's consent, shall be effective unless, within 10 days of the date hereof, said guarantors sign this Sublease thereby giving their consent to this Sublease.

8.3     In the event that Master Lessor does give such consent then:

(a)     Such consent shall not release Sublessor of its obligations or alter the primary liability of Sublessor to pay the Rent and perform and comply with all of the obligations of Sublessor to be performed under the Master Lease.

(b)     The acceptance of Rent by Master Lessor from Sublessee or any one else liable under the Master Lease shall not be deemed a waiver by Master Lessor of any provisions of the Master Lease.

(c)     The consent to this Sublease shall not constitute a consent to any subsequent subletting or assignment.

(d)     In the event of any Default of Sublessor under the Master Lease, Master Lessor may proceed directly against Sublessor, any guarantors or any one else liable under the Master Lease or this Sublease without first exhausting Master Lessor's remedies against any other person or entity liable thereon to Master Lessor.

(e)     Master Lessor may consent to subsequent sublettings and assignments of the Master Lease or this Sublease or any amendments or modifications thereto without notifying Sublessor or any one else liable under the Master Lease and without obtaining their consent and such action shall not relieve such persons from liability.

(f)     In the event that Sublessor shall Default in its obligations under the Master Lease, then Master Lessor, at its option and without being obligated to do so, may require Sublessee to attorn to Master Lessor in which event Master Lessor shall undertake the obligations of Sublessor under this Sublease from the time of the exercise of said option to termination of this Sublease but Master Lessor shall not be liable for any prepaid Rent nor any Security Deposit paid by Sublessee, nor shall Master Lessor be liable for any other Defaults of the Sublessor under the Sublease.

(g)     Unless directly contradicted by other provisions of this Sublease, the consent of Master Lessor to this Sublease shall not constitute an agreement to allow Sublessee to exercise any options which may have been granted to Sublessor in

INITIALS

P R

INITIALS

©1997 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

the Master Lease (see Paragraph 39.2 of the Master Lease).

8.4    The signatures of the Master Lessor and any Guarantors of Sublessor at the end of this document shall constitute their consent to the terms of this Sublease.

8.5    Master Lessor acknowledges that, to the best of Master Lessor's knowledge, no Default presently exists under the Master Lease of obligations to be performed by Sublessor and that the Master Lease is in full force and effect.

8.6    In the event that Sublessor Defaults under its obligations to be performed under the Master Lease by Sublessor, Master Lessor agrees to deliver to Sublessee a copy of any such notice of default. Sublessee shall have the right to cure any Default of Sublessor described in any notice of default if Sublessee does so within the same number of days set forth in the notice of default given to Sublessor. If such Default is cured by Sublessee then Sublessee shall have the right of reimbursement and offset from and against Sublessor.

9.    **Additional Brokers Commissions.**

9.1    Sublessor agrees that if Sublessee exercises any option or right of first refusal as granted by Sublessor herein, or any option or right substantially similar thereto, either to extend the term of this Sublease, to renew this Sublease, to purchase the Premises, or to lease or purchase adjacent property which Sublessor may own or in which Sublessor has an interest, then Sublessor shall pay to Broker a fee in accordance with the schedule of Broker in effect at the time of the execution of this Sublease. Notwithstanding the foregoing, Sublessor's obligation under this Paragraph is limited to a transaction in which Sublessor is acting as a Sublessor, lessor or seller.

9.2    If a separate brokerage fee agreement is attached then Master Lessor agrees that if Sublessee shall exercise any option or right of first refusal granted to Sublessee by Master Lessor in connection with this Sublease, or any option or right substantially similar thereto, either to extend or renew the Master Lease, to purchase the Premises or any part thereof, or to lease or purchase adjacent property which Master Lessor may own or in which Master Lessor has an interest, or if Broker is the procuring cause of any other lease or sale entered into between Sublessee and Master Lessor pertaining to the Premises, any part thereof, or any adjacent property which Master Lessor owns or in which it has an interest, than as to any of said transactions, Master Lessor shall pay to Broker a fee, in cash, in accordance with the schedule attached to such brokerage fee agreement.

9.3    Any fee due from Sublessor or Master Lessor hereunder shall be due and payable upon the exercise of any option to extend or renew, upon the execution of any new lease, or, in the event of a purchase, at the close of escrow.

9.4    Any transferee of Sublessor's interest in this Sublease, or of Master Lessor's interest in the Master Lease, by accepting an assignment thereof, shall be deemed to have assumed the respective obligations of Sublessor or Master Lessor under this Paragraph 9. Broker shall be deemed to be a third-party beneficiary of this paragraph 9.

10.    **Representations and Indemnities of Broker Relationships.**  The Parties each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Sublease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Sublessee and Sublessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

11.    **Attorney's fees.**  If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Sublessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

12.    **No Prior or Other Agreements; Broker Disclaimer.**  This Sublease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. ~~Sublessor and Sublessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Sublease~~ and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees), of any Broker with respect to negotiation, execution, delivery or performance by either Sublessor or Sublessee under this Sublease or any amendment or modification hereto shall be limited to an amount up to the fee received by such Broker pursuant to this Sublease, provided, however, that the foregoing ~~limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.~~   *SBM*

13.    **Accessibility; Americans with Disabilities Act.**

(a)    The Premises:

☑ Have not undergone an inspection by a Certified Access Specialist (CASp). Note: A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or

_____
INITIALS

_____
INITIALS

©1997 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM SBL-8-12/16E

potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

☐ Have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq. Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential.

☐ Have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq. Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential except as necessary to complete repairs and corrections of violations of construction related accessibility standards.

In the event that the Premises have been issued an inspection report by a CASp the Lessor shall provide a copy of the disability access inspection certificate to Lessee within 7 days of the execution of this Lease.

(b)    Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY REAL ESTATE BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS SUBLEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1.  SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS SUBLEASE.

2.  RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO:  THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PROPERTY, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR SUBLESSEE'S INTENDED USE.

WARNING:  IF THE SUBJECT PROPERTY IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE SUBLEASE MAY NEED TO BE REVISED TO COMPLY WITH LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED

14. Consent of Master Lessor. This sublease shall not be effective unless, within thirty (30) days of the date hereof, Master Lessor consents in writing to this Sublease. The signature of the Master Lessor below shall constitute its consent to the terms of this Sublease.

| | |
|---|---|
| Executed at _____ | Executed at _____ |
| On: _____ | On: _____ |
| By Sublessor: | By Sublessee: |
| Stator Bros. Markets, a California corporation | Carolina Transportation, Inc. |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: Petr Radchishin |
| Title: Chief Executive Officer/President | Title: President |
| By: _____ | By: _____ |
| Name Printed: David J. Harris | Name Printed: _____ |
| Title: Exec V.P.-Finance & CFO | Title: _____ |
| Address: 301 S. Tippecanoe Avenue | Address: 120 Dogwood Rd |
| San Bernardino, CA  92408 | Candler NC  28806 |
| Telephone:(909) 733-5000 | Telephone:(828) 367-7799 |
| Facsimile: (909) 379-0475 | Facsimile:(828) 205-7878 |
| Email: _____ | Email: petr@rpmcarolina.com |
| Email: _____ | Email: michael@rphdispatch.com |
| Federal ID No. _____ | Federal ID No. _____ |
| BROKER: | BROKER: |
| Lee & Associates®-Ontario | Jones Lang LaSalle |
| Attn: Joe McKay | Attn: Patrick Wood / Cody Clayton |
| Title: Senior Vice President/Principal | Title: Vice President / Associate |
| Address: 3535 Inland Empire Blvd. | Address: 3281 E. Guasti Rd, Suite 850 |
| Ontario, CA  91764 | Ontario, CA  91761 |

PAGE 6 OF 7

INITIALS                                                                                              INITIALS

©1997 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                    FORM SBL-8-12/16E

Telephone/Facsimile: 909-373-2914/909-373-2985          Telephone/Facsimile: 909-467-6857/312-416-5421
Email: jmckay@lee-assoc.com                              Email: cody.clayton@am.jll.com
Federal ID No. _____                  Federal ID No. _____
Broker/Agent BRE License #: _____               Broker/Agent BRE License #: _____
                                                         _____

Consent to the above Sublease is hereby given.
Executed at: _____            Executed at: _____
On: _____             On: _____

By Master Lessor:                                        By Guarantor(s):
IIT Redlands Industrial Center I, LP, a                  By: _____
Delaware limited partnership                             Name Printed: _____
                                                         Address: _____
By: _____             _____
Name Printed: _____
Title: _____

By: _____             By: _____
Name Printed: _____             Name Printed: _____
Title: _____            Address: _____
Address: _____             _____

Telephone:(   ) _____
Facsimile:(   ) _____
Email: _____
Federal ID No. _____

NOTICE:  These forms are often modified to meet changing requirements of law and industry needs.  Always write or call to make sure you
are utilizing the most current form.  AIR Commercial Real Estate Association, 800 N Brand Blvd, Suite 600, Glendale, CA 91203.
Telephone No. (213) 687-8777.  Fax No.: (213) 687-8616.

©Copyright 1997 By AIR Commercial Real Estate Association.
All rights reserved. No part of these works may be reproduced in any form without permission in writing.

INITIALS                                  PAGE 7 OF 7                                  INITIALS
©1997 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                  FORM SBL-8-12/16E

# EXHIBIT "A"

**±65,520 SF**

**1450 MOUNTAIN VIEW**



# EXHIBIT "A"



initials



initials



**EXHIBIT C**

## CONSENT BY LANDLORD TO SUBLEASE

Whereas, the undersigned is the current Landlord under that certain Lease Agreement, dated January 9, 2009 (as amended and extended from time to time, the "Prime Lease"), with Stater Bros. Markets, a California Corporation ("Tenant") for that certain premises located at 1450 Mountain View Avenue, Redlands, CA 92374 (the "Premises").

Whereas, Tenant desires to enter into that certain Sublease Agreement, dated February 6, 2018, a copy of which is attached hereto as Exhibit A (the "Sublease"), with Carolina Transportation Inc. ("Subtenant") for the Premises and has requested that Landlord consent to the Sublease. Landlord hereby conditionally consents to the entry into the Sublease upon the express understandings and conditions that:

1. Landlord neither approves nor disapproves the terms, conditions and agreements contained in the Sublease (all of which shall be subordinate and subject at all times to the terms, covenants and conditions of the Prime Lease) and assumes no liability or obligation of any kind whatsoever on account of anything contained in the Sublease;

2. By executing this consent, Landlord shall not be deemed to have waived any rights under the Prime Lease nor shall Landlord be deemed to have waived Tenant's obligations to obtain any required consents under the Prime Lease (other than consent to the Sublease);

3. Notwithstanding anything in the Sublease to the contrary, Tenant shall be and continue to remain liable for the payment of rent and the full and prompt performance of all of the obligations of Tenant under and as set forth in the Prime Lease;

4. Nothing contained in the Sublease shall be taken or construed to in any way modify, alter, waive or affect any of the terms, covenants or conditions contained in the Prime Lease, or be deemed to grant Subtenant any privity of contract with Landlord, or require Landlord to accept any payments from Subtenant on behalf of Tenant;

5. This Sublease shall be deemed and agreed to be a sublease only and not an assignment and there shall be no further subletting or assignment of all or any portion of the Premises demised under the Prime Lease except in accordance with the terms and conditions of the Prime Lease;

6. If Landlord terminates the Prime Lease as a result of a default by Tenant thereunder, the Sublease shall automatically terminate concurrently therewith unless Landlord elects in writing to keep the Sublease in full force and effect in which case the Sublease shall be deemed a direct indenture of lease between Landlord and Subtenant.

### LANDLORD

WESTERN A WEST CA, LLC,
a Delaware limited liability company

By:   GLP US Management LLC,
       a Delaware limited liability company,
       as agent for Landlord

By:
Name: Robert Minson
Title: SVP — Regional Director

Dated: February 26 , 2018

Acknowledged and Agreed to by Tenant:

STATER BROS. MARKETS, a California corporation

By: _Michael Read_
Name: _Michael Read_
Title: _VP Real Estate_
Dated: _2/26/18_

Acknowledged and Agreed to by Subtenant:

CAROLINA TRANSPORTAION, INC.

By: _D. Sychip_
Name: _Dmitry Sychou_
Title: _COO_
Dated: _February 26  2018_

800-422-9191
www.prosupplies.net

TREEHUGGER™
30% PCW RECYCLED TAB
A Pro Office and Filing Supplies Product

**EXHIBIT D**



**From:** Clayton, Cody [mailto:cody.clayton@am.jll.com]
**Sent:** Thursday, March 01, 2018 10:14 AM
**To:** Joe McKay; Michael Reed

**Cc:** Mike Fine
**Subject:** RE: Carolina Transportation

Joe,

Just spoke with my client. Looks like they will get us a timeline soon, likely tomorrow. Waiting to hear back from them but we will reach out once we get a timeline in place. As you know, head of company is just having some heart ache as they had to extend their lease 15 days in current location at 200% due to the process taking a longer than they expected. Hoping to get something shortly and will relay message immediately.

Thanks,

**Cody Clayton | Associate**
D: +1-909-467-6864 | C: +1-310-977-1377
Brokerage | RE License #02006423
Jones Lang LaSalle Brokerage, Inc.
Real Estate License #01856260
cody.clayton@am.jll.com | www.jll.com



**From:** Joe McKay [mailto:jmckay@lee-assoc.com]
**Sent:** Thursday, March 01, 2018 8:18 AM
**To:** Michael Reed <Michael.Reed@staterbros.com>; Clayton, Cody <cody.clayton@am.jll.com>
**Cc:** Mike Fine <mfine@lee-assoc.com>
**Subject:** [EXTERNAL] Re: Carolina Transportation

Cody we need at least 3 hour notice.

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

**From:** Michael Reed
**Sent:** Thursday, March 1, 2018 8:14 AM
**To:** 'Clayton, Cody'
**Cc:** Joe McKay; Mike Fine
**Subject:** RE: Carolina Transportation

All,

When will we do the handoff today.  I have my security team on standby to show Carolina how to use the alarm system, but I need a time.

Thank you,

Mike



**EXHIBIT  E**



**From:** Michael Babchenko [mailto:michael@rpmdispatch.com]
**Sent:** Monday, March 05, 2018 2:18 PM
**To:** Clayton, Cody <cody.clayton@am.jll.com>
**Cc:** Wood, Patrick <Patrick.Wood@am.jll.com>
**Subject:** [EXTERNAL] Re: FW: Carolina Transportation

Hi all,

Our CEO decided to cancel this lease agreement, because:
1. We didn't receive even key from warehouse on the commence date
2. We lost very important customers, because we didn't have a chance to show new warehouse.
3. You didn't provide any reason for delay in the written form.
4. We needed to make "hold over" for the next 6 month, and pay almost double price.
5. CEO didn't get original lease agreement till now. For us it one sided signed agreement for this moment.

2018-03-01 17:32 GMT-05:00 Clayton, Cody <cody.clayton@am.jll.com>:

Michael,

See below from Stater Bros. Please reach out immediately after you have discussed with your boss. We have the keys for you and Stater Bros has agreed to meet you out there and show you the alarm system to make sure you have access to everything.

Thanks.

**Cody Clayton | Associate**
D: +1-909-467-6864 | C: +1-310-977-1377
Brokerage | RE License #02006423



30% PCW Recycled Tab
Order online today
www.sourceonecorp.com
800-422-9191

**EXHIBIT F**

**From:** Michael Reed
**Sent:** Tuesday, March 06, 2018 6:01 PM
**To:** 'Clayton, Cody'; Joe McKay
**Cc:** Wood, Patrick; Mike Fine; Cody Wolf
**Subject:** RE: FW: Carolina Transportation

Cody,

This is not how the process works.  They cannot cancel a lease that is already signed.  I suggest you schedule a conference call with Carolina and myself immediately.  And someone better explain to me how the ball was dropped on the lines of communication with Carolina.

Thank you,

Mike

**From:** Clayton, Cody [mailto:cody.clayton@am.jll.com]
**Sent:** Tuesday, March 06, 2018 5:52 PM
**To:** Joe McKay; Michael Reed
**Cc:** Wood, Patrick; Mike Fine; Cody Wolf

**Subject:** FW: FW: Carolina Transportation

Joe,

See below from Carolina. As discussed, I have not been able to get the Carolina point of contact on the phone since the 1st but he finally sent this email to us yesterday afternoon and has not responded to our other emails and calls today.

Please advise how you would like to handle this.


Thanks,

**Cody Clayton | Associate**
D: +1-909-467-6864 | C:+1 310-977-1377
Brokerage | RE License #02006423
Jones Lang LaSalle Brokerage, Inc.
Real Estate License #01856260
cody.clayton@am.jll.com | www.jll.com




**From:** Michael Babchenko [mailto:michael@rpmdispatch.com]
**Sent:** Monday, March 05, 2018 2:18 PM
**To:** Clayton, Cody <cody.clayton@am.jll.com>
**Cc:** Wood, Patrick <Patrick.Wood@am.jll.com>
**Subject:** [EXTERNAL] Re: FW: Carolina Transportation

Hi all,

Our CEO decided to cancel this lease agreement, because:
1.We didn't receive even key from warehouse on the commence date
2.We lost very important customers, because we didn't have a chance to show new warehouse.
3.You didn't provide any reason for delay in the written form.
4. We needed to make "hold over" for the next 6 month, and pay almost double price.
5. CEO didn't get original lease agreement till now. For us it one sided signed agreement for this moment.

2018-03-01 17:32 GMT-05:00 Clayton, Cody <cody.clayton@am.jll.com>:

> Michael,
>
> See below from Stater Bros. Please reach out immediately after you have discussed with your boss. We have the keys for you and Stater Bros has agreed to meet you out there and show you the alarm system to make sure you have access to everything.
>
>
> Thanks,
>
> **Cody Clayton | Associate**
> D: +1-909-467-6864 | C: +1-310-977-1377
> Brokerage | RE License #02006423



30% PCW Recycled Tab
Order online today
www.sourceoneop.com
cs@sourceoneop.com
800-677-3031

**EXHIBIT  G**